UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIA VICTORIA FERRER,
CHARLES LISÉE, and
MIYA SHANI HOOKS,

        Plaintiffs,

                                       Case No. 22-cv-11427
v.                                Honorable Linda V. Parker

DETROIT CLUB MANAGEMENT CORP.,
d/b/a The Detroit Club, SUZETTE DAYE,
and LYNN URALLI,

        Defendants.
_____/

## OPINION AND ORDER

This lawsuit arises from Plaintiffs' employment with the Detroit Club (also

"Club").  Plaintiffs claim that they were terminated or constructively discharged

after being the target of racial discrimination and/or complaining about

discriminatory acts and comments towards African American patrons and

employees of, and other workers at, the Club by Plaintiffs' supervisor, Defendant

Suzette Daye, and the Club's owner and president, Lynn Uralli.  Plaintiff Maria

Victoria Ferrer is Latino.  Plaintiff Miya Shani Hooks is African American.  In an

Amended Complaint filed July 28, 2022, Plaintiffs allege the following claims

against Defendants: (I) retaliation in violation of 42 U.S.C. § 1981; (II) retaliation

in violation of Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"); (III) racial

discrimination in the form of a hostile work environment in violation of ELCRA;

(IV) race discrimination in violation of § 1981; and (V) race discrimination in

violation of ELCRA.

The matter is presently before the Court on the following motions:

- Plaintiffs' motion for leave to file a second amended complaint (ECF No. 48);

- Plaintiffs' motion for sanctions, leave to amend, and to disqualify Defendants' counsel (ECF No. 49);

- Defendants' motion for reconsideration (ECF No. 52);

- Defendants' Motion to Reopen Discovery (ECF No. 58); and

- Defendants' Motion to Expedite Defendants' Motion to Reopen Discovery (ECF No. 59).

Plaintiffs' motions are fully briefed.  The Court did not request a response to

Defendants' motion for reconsideration.  *See* E.D. Mich. LR 7.1(h)(3).  Plaintiff

has filed a response to Defendants' motion to reopen discovery.

## I.   Plaintiffs' Motion to Amend

Plaintiffs seek leave to amend their complaint to add retaliation, hostile work

environment, and discrimination claims under Title VII of the Civil Rights Act of

1964, now that they have received right-to-sue letters from the U.S. Equal

Employment Opportunity Commission.  Previously, Defendants agreed to the

amendment provided the time for filing the claims (i.e., 90 days from receipt of the

EEOC's notice) had not expired.  Defendants now concede the time has not

expired, although they request a 60-day window to conduct additional discovery if the amendment is allowed.[1]

Defendants provide the following reasons for requesting additional discovery in response to Plaintiffs' proposed amendment: (a) Title VII prohibits disparate impact discrimination while § 1981 does not; and (b) § 1981 does not have any cap on damages.  Yet, Plaintiffs are not asserting a disparate impact claim under Title VII.[2]  Instead, as they do in their § 1981 and ELCRA claims, they are claiming disparate treatment.[3]  The Court is at a loss for why additional discovery would be needed due to the addition of claims for which there is a cap on damages.

Therefore, the Court is granting Plaintiffs' request to amend their pleading. The Court concludes that the amendment does not warrant additional discovery.

---

[1] In their response brief, Defendants also oppose the addition of new individuals as defendants.  In the proposed amended pleading attached to their motion, however, Plaintiffs do not add any parties.  (*See* ECF No. 1.)  In their motion for sanctions, Plaintiffs do seek to add Lynn Uralli's husband, Emre Uralli, as a defendant, contending that previously withheld and now discovered documents show that he has an ownership interest in The Detroit Club and/or is involved in its management.  The Court will address that request separately.

[2] Disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."  *Lyon v. Ohio Educ. Ass'n*, 53 F.3d 135, 138 (6th Cir. 1995) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).

[3] Disparate treatment arises where the defendant "simply treats some people less favorably than others" based on protected criteria.  *Lyon*, 53 F.3d at 138 (quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 335 n.15).

3

II.     **Plaintiffs' Motion for Sanctions, Leave to Amend, and to Disqualify
        Counsel**

Plaintiffs' motion for sanctions arises from documents Defendants failed to

produce in response to Plaintiffs' discovery requests, despite being responsive to

those requests, which Plaintiffs independently obtained from a former Detroit Club

employee.

A.     **Background**

As indicated, Plaintiffs allege in this lawsuit that, during their employment,

they were the targets of racism at the Detroit Club and/or witnessed racism against

other employees, workers, and patrons.  On October 7, 2022, Plaintiffs served their

First Interrogatories and Requests for Production on Defendants, which sought

*inter alia* discovery regarding any prior complaints of racial discrimination or

retaliation against or relating to the Detroit Club and/or Uralli, whether by

Plaintiffs or others.  (*See, e.g.*, ECF No. 49-9 at PageID. 6073-74; ECF No. 49-10

at PageID. 6082-83.)  Defendants responded that there were no prior complaints,

and that they had no documentation responsive to Plaintiffs' requests.[4]  (*Id.*)

Plaintiffs also asked for "all texts or emails sent or received by Defendant Lynn

---

[4] Plaintiffs have told the Court that Uralli and other Club management employees
similarly testified during their depositions in this matter that there have been no
complaints of racism against the Club by staff, guests, invitees, and patrons except
for those now made by Plaintiffs in this lawsuit.  (*See* ECF No. 47 at PageID.
5829.)

4

Uralli from August 2021 until the present using the following search terms: a. black; b. ghetto; c. nigger; d. Mexican; e. gangbanger; f. gang; g. pig; [or] h. white." (ECF No. 49-10 at PageID. 6083.)  Defendants responded that there were "[n]one in Defendants' possession." (*Id*.)  Defendants gave a similar answer in response to Plaintiffs' requests for emails, text messages, emails, or correspondence between Uralli and Daye and between Uralli and Chance Armstrong, the former general manager of the Detroit Club, "discussing any Plaintiff, race, racism, member complaints, employee complaints, discrimination, or the dress code policy from August 2021 until the present." (*Id*. at PageID. 6083-84.)

Plaintiffs deposed Uralli on May 31, 2023.  (*See* ECF No. 34-23.)  During the deposition, Uralli was asked a question concerning how she would respond to reported discrimination at the Detroit Club, to which she answered that "[n]o one has ever reported discrimination to me other than Victoria Ferrer." (*Id.* at PageID. 2091.)

Beginning in late August 2023 through late September 2023, the parties filed briefs in support of and in response and reply to cross-motions for summary judgment, relying in part on the information obtained during discovery.  (*See* ECF Nos. 33-35, 37-38, 39, 42.)

i.    **Undisclosed Documents**

On January 29, 2024, Plaintiffs' counsel received an email from an anonymous individual, who claimed to be a former Club employee with knowledge that several defense witnesses lied during their depositions and that Defendants withheld documents during the discovery process. (*See* ECF No. 49-6 at PageID. 6040-41.)  The individual offered some examples of irregularities and corroborating evidence related to Armstrong's deposition.  (*Id.*)  This former employee turned out to be Matthew Laurenic.  On February 20, Plaintiffs' counsel met with Laurenic, who gave Plaintiffs' counsel numerous documents.  (ECF No. 49-2.)

One of those documents was an email, dated Sunday April 24, 2022, from the Detroit Club's then Beverage Manager and now Assistant General Manager, Jennifer Thomason, to Armstrong, Lynn Uralli, Emre Uralli, Suzette Daye, and another individual.  (*Id.* at PageID. 5938; *see also* ECF No. 35-18 at PageID. 3280.)  In the email, Thomason talks about Ferrer's termination the night before and the response from employees, including two individuals who approached Thomason and "used the term racist and racism many times."  (ECF No. 49-2 at PageID. 5938.)  Thomason shares that this was the third conversation she had to have with staff "on this subject in a very short amount of time[,]" which "started with some accusations from [Ferrer] at the front and moved on to the Remy photo

shoot I scheduled myself and lastly to this most current event with the nasty [G]oogle review I emailed separately to [C]hance and [L]ynn." (*Id.*) Thomason writes: "It is very clear we are at a point that some sort of minority sensitivity training may need to be set in place." (*Id.*) Other documents that Laurenic gave Plaintiffs' counsel were responsive to Plaintiffs' discovery requests.

For example, in a Saturday April 9, 2022 email from Lisée to Armstrong, with the subject line "Racism," Lisée refers to "ongoing racism that non-Caucasian guests are brutalized with when entering the club." (*Id*. at PageID. 5940.) Lisée's email was produced during discovery; however, what was not produced were the documents reflecting that the email subsequently was forwarded to Club management. (ECF No. 56 at PageID. 6683 n.1.)

Specifically, five minutes after Armstrong received Lisée's email, he forwarded it to Uralli and Thomason. (ECF No. 49-2 at PageID. 5940.) On July 7, 2022, it was sent to Michael D'Agnese, the Club's Controller and Emre Uralli's "right hand man," who was identified, along with Lynn Uralli, as having answered Plaintiffs' discovery requests on behalf of Defendants. (*Id*. at PageID. 5940-41; *see also* ECF No. 34-23 at PageID. 2159-61; ECF No. 34-24 at PageID. 2275; ECF No. 49-9 at PageID. 6072.)

Also included in the documents received from Laurenic was a chain of emails on February 28, 2022, regarding Armstrong's notes from the day, which

apparently discussed interactions between a Club employee(s) and a couple visiting the Club, where the husband was possibly a retired cop.  (*Id*. at PageID. 5942-43.)  Armstrong's notes have not been shared with the Court and the emails do not make clear what exactly transpired between the Club employee and its patrons.  The discussion in the emails suggests, though, that discrimination based on race, color, religion, or some other protected category was involved.  (*See id*.)

Another email from Club employee Mary Ward to Armstrong, dated Saturday February 5, 2022, discussed Ward's need to apologize to a Club member after another Club employee, Meredith Campbell, "looked (her) up and down" and the member witnessed two guests leaving the spa being told they were not able to have drinks.  (ECF No. 49-2 at PageID. 5947.)  Ward says:  "I understand that we have a dress code, but all 3 guests were black and it came across very poorly." (*Id*.)  Armstrong forwarded Ward's email to Daye and Lynn Uralli a couple of hours later, indicating that "[t]his seems to be a constant and recurring issue with Meredith.  This is the second complaint I have about her in this matter today alone."  (*Id*.)

Shortly thereafter, Armstrong drafted a letter "regarding Detroit Public Schools" ("DPS") which he shared with Lynn Uralli.  (*Id*. at PageID. 5976.)  The letter, addressed to Tyrone E. Winfrey, Sr., the Executive Director of Community Affairs for DPS, addresses Winfrey "feeling 'unwelcome' and 'unwanted' at the

Detroit Club" due to race discrimination.  (*Id*. at PageID. 5977.)  Armstrong

defended his behavior and asserted: "I am not racist; the Detroit Club is not racist,

and we do not discriminate against members or guests based on the color of their

skin."  (*Id*. at PageID. 5978.)

The documents Laurenic provided also included a May 27, 2022 email to

Armstrong from Alyssa Cotton, the owner of a staffing company, after the Club

refused to compensate Cotton's company for the employees it provided for a Club

event.  (*Id*. at PageID. 5950-51.)  Cotton conveyed that her employees were treated

poorly, and that "[t]he owner made a few racist remarks and was very rude and

disrespectful."  (*Id*. at PageID. 5951.)

### ii.    Laurenic

Laurenic, who has experience as an investigative journalist and obtaining

court documents through that capacity, was employed at the Detroit Club from

October 3, 2022 until November 14, 2023.  (ECF No. 49-3 at PageID. 5996 ¶¶ 2,

5.)  While being interviewed, the Club's Assistant General Manager, Jennifer

Thomason, told Laurenic about a lawsuit brought by former employees (i.e., the

present matter).  (*Id*. ¶ 3.)  Laurenic researched the case before accepting the offer

of employment.  (*Id*. ¶ 4.)

During his employment, Laurenic had access to a computer and was

provided with login access.  (*Id*. ¶ 6.)  He had administrative access to the Club's

Google workspace and to Club email accounts, including the accounts of current and former employees. (*Id*. ¶¶ 7-8.) To perform the tasks assigned to him during his employment, Laurenic routinely accessed Armstrong's email account. (*Id*. ¶ 9.)

Virtual depositions in this matter were taken during Laurenic's employment, and Lynn Uralli would tune in remotely while she was at the Club, with the volume at a level allowing anyone in the office to hear what was being said. (*Id*. ¶¶ 11-12.) During the deposition of Reema Jilani, Lynn Uralli asked Laurenic if she should text Jilani to shorten her answers. (*Id*. ¶ 12.) Laurenic was suspicious of Lynn Uralli's denial of discrimination at the Club, as he overheard bigoted comments between her and Jennifer Thomason regarding an employee. (*Id*. ¶ 13.)

In Summer and early Fall 2023, still during his employment, Laurenic began searching the emails between Thomason and Armstrong, and he found emails that he maintains "depict[] the opposite of what Lynn Uralli and Jennifer Thomason claimed to be true regarding prior complaints of discrimination at the Detroit Club." (*Id*. at PageID. 5996-97, ¶ 14.) Laurenic also obtained deposition transcripts, which had been filed on the docket in the present matter and were available through the Public Access to Court Electronic Records (PACER) system. According to Laurenic, Lynn Uralli falsely testified that Laurenic performed one-on-one diversity and inclusion training with front desk employees. (*Id*. ¶ 18.) Laurenic states that he never performed such training, he never received such

10

training during his employment with the Detroit Club, and he is unaware of any Club employees receiving such training.  (*Id.*)  According to Laurenic, he found inconsistencies between what deponents said on behalf of the Detroit Club and what he found in emails.  (*Id.* ¶ 19.)

As indicated, Laurenic shared the unproduced documents with Plaintiffs' counsel on February 20, 2024.  The same day, Plaintiffs' counsel emailed Defendants' counsel, indicating that a person identifying himself as a former Club management employee had dropped off the withheld documents, which were attached to the email.  (ECF No. 49-11 at PageID. 6091.)  Plaintiffs' counsel shared the steps he was considering in response.  (*Id.*)

On February 23, 2024, Laurenic received six phone calls and a text message from Lynn Uralli, although his previous attempts to reach Uralli through phone, text, and email regarding unpaid wages following his employment separation in November 2023 had been "largely ignored."  (ECF No. 49-3 at PageID. 5997 ¶¶ 21-22.)  On February 26 and 27, Laurenic received emails from Thomason requesting the return of a company phone, which Laurenic states he returned on the date of his separation from the Club.  (*Id.* ¶ 23; *see also id.* at PageID. 5998-6000.)  Despite Laurenic's indications that he had left the phone in his desk drawer, Thomason threatened to go to the police to file a report concerning the phone.  (*Id.*)

### iii.    Proceedings in this Matter

At a status conference on March 7, 2024, Plaintiffs' counsel shared what had transpired with respect to the now-obtained documents and claimed that discovered information suggested that Uralli and Club managers lied during their depositions in this matter.  (*See* ECF No. 47.)  In response, defense counsel represented during the conference that: (1) the documents at issue revealed nothing not already known to Plaintiffs; (2) Defendants had not provided the documents to defense counsel and, when counsel asked Defendants to look for them in the Detroit Club's system after Laurenic shared them, Defendants claimed the materials were not there; and (3) Defendants found through IT or were having IT assess whether Laurenic used a stolen phone to hack into the Detroit Club's system after he was terminated in November 2023, to modify or delete certain information.  (*Id.*)

Given that the pending summary judgment motions appeared to have been briefed without Plaintiff having access to all material and discoverable information and were supported by testimony Plaintiffs maintain may, in part, constitute perjury, the Court denied the motions without prejudice to be refiled after it resolved the discovery abuses claimed by Plaintiffs.  The Court then allowed Plaintiffs to file the current motion for sanctions.

In their motion, Plaintiffs ask to amend their Complaint to add Emre Uralli as a defendant, as they claim the now disclosed documents demonstrate that he owns and controls the Detroit Club.  Plaintiffs also seek discovery sanctions

12

pursuant to Federal Rule of Civil Procedure 37, including a default judgment and costs and attorney's fees.  They also seek sanctions pursuant to Federal Rule of Civil Procedure 30(d)(2) based on their claim that Plaintiffs have threatened deponents.  Lastly, Plaintiffs ask the Court to disqualify defense counsel, who Plaintiffs charge with playing a role in the alleged discovery abuses or, at least, was willfully blind to those abuses.

### B.    Applicable Law & Analysis

Rule 37 allows for the imposition of sanctions for the failure "to obey a court order to produce or permit discovery, including an order under Rule 26(f), 35, or 37(a)[.]"  Fed. R. Civ. P. 37(b)(2)(A).  The rule offers a partial list of available sanctions, which include "staying further proceedings until the order is obeyed" and "rendering a default judgment against the disobedient party[.]"  *Id.*

Defendants argue that Rule 37(b)(2) is inapplicable because Plaintiffs never filed a motion to compel, resulting in a court order that Defendants or their counsel violated.  Yet this Court issued a Rule 26 scheduling *order* which required the parties to produce all discoverable evidence by a specified deadline.  *See United States v. Reyes*, 307 F.3d 451, 457 n.3 (6th Cir. 2002) (citing authority providing that "Rule 37(b) usually has no application if there has not been a court order," but specifically underscoring that "[t]he district court entered a scheduling order pursuant to Rule 26(f)" setting a deadline for completing discovery).

13

Moreover, this Court is unsure how a party could be expected to file a motion to compel when documents responsive to discovery requests are withheld and the party has absolutely no knowledge they exist. *Jackson v. Nissan Motor Corp.*, No. 88-6132, 1989 WL 128639, at *5 (6th Cir. 1989) (citing *Badalamenti v Dunhan's Shelley Radiant Ceiling Co.*, 118 F.RD. 437, 439 (E.D. Mich. 1987)) (explaining that "[t]he rational for allowing sanctions without contempt of a prior court order is that an injured party may be unaware that key discovery information has been withheld and, therefore, may not seek an order to compel discovery").  If the documents are discovered through other means, as they were here, what would be the point then of filing a motion to compel?  In any event, Federal Rule of Civil Procedure 37(d) provides an alternative avenue for sanctions based on a party's failure to respond after being served with discovery requests, and the "majority view authorizes Rule 37(d) sanctions when a party's 'evasive or incomplete answers to proper interrogatories impede discovery.'" *Jackson v. Nissan Motor Corp.*, No. 88-6132, 1989 WL 128639, at *5 (6th Cir. 1989) (quoting *Badalamenti*, 118 F.RD. at 439).

In deciding whether dismissal is an appropriate sanction under Rule 37, courts consider four factors:

> (1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic

sanctions were imposed or considered before dismissal was ordered.
*Mager v. Wis. Central Ltd.*, 924 F.3d 831, 837 (6th Cir. 2019) (quoting *United States v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002)).  No single factor is dispositive; however, "dismissal is proper if the record demonstrates delay or contumacious conduct."  *Id.* (quoting *Reyes*, 307 F.3d at 458); *see also Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 366-68 (6th Cir. 1997).  "Contumacious conduct refers to behavior that is perverse in resisting authority and stubbornly disobedient."  *Id.* (quoting *Carpenter v. Flint*, 723 F.3d 700, 705 (6th Cir. 2013)).

This Court cannot conclude that Defendants engaged in "contumacious conduct."  Nevertheless, the discovery violations appear to have been willful, at least on the part of Defendants as opposed to their counsel.  The now uncovered documents reflect that Defendants were aware of previous complaints of racism brought by Detroit Club employees, workers, and patrons; however, they denied that anything of the sort had ever occurred and failed to disclose electronic communications discussing these matters.  Counsel, on the other hand, seems to have been simply negligent in overseeing Defendants' responses to Plaintiffs' discovery requests—for example, not providing sufficient guidance to Defendants to locate relevant electronic documents responsive to Plaintiffs' discovery  More importantly, however, there is no evidence to suggest that Counsel was more involved.

15

Nevertheless, Plaintiffs have not been significantly prejudiced by Defendants' conduct.  Although  Defendants behavior is sanctionable, Plaintiffs have obtained the electronic messages Defendants withheld.  Plaintiffs now have the evidence to respond to any refiled summary judgment motion or to file their own, and to use if the case goes to trial.  To the extent the now-obtained discovery shows that a witness testified untruthfully at his or her deposition, the ability to present that falsehood to a jury to impeach the witness is a far more powerful weapon than most of the sanctions this Court would be inclined to impose.  *See* Fed. R. Evid. 608(b).

There were no previous warnings by the Court with respect to the disclosure or failure to disclose.  Finally, the Court finds sanctions other than dismissal appropriate under the circumstances.  Specifically, the Court is requiring Defendants to pay the reasonable attorneys' fees and costs Plaintiffs incurred responding to Defendants' summary judgment, pursuing Plaintiffs' own summary judgment motion without the aid of this discovery, and pursuing discovery sanctions.

The Court is not convinced that defense counsel should be disqualified. Disqualification is an extreme sanction reserved for "when there is a reasonable possibility that some specifically identifiable impropriety actually occurred." *Moses v. Sterling Commerce (Am.), Inc.*, 122 F. App'x 183 (6th Cir. 2005) (internal

16

quotation marks and citation omitted).  Undoubtedly, if Defendants' attorneys did not do so, they should have confirmed that Defendants used sufficient terms to search their electronic records to capture all responsive documents.  Nevertheless, it is not clear that the failure to disclose the documents at issue was due to inadequate search terms, as opposed to Defendants' unwillingness to produce what was found.

As a final form of relief, Plaintiffs seek leave to add Emre Uralli as a defendant.  Plaintiffs contend that Defendants previously "shrouded" his ownership and involvement in the Detroit Club and, in response to Plaintiffs' discovery requests, identified Lynn Uralli as the Club's only owner.  Plaintiffs have not convinced the Court that Emre is a shareholder, officer, director, incorporator, or owner of the Detroit Club.  He, perhaps, was involved in its day-to-day operations. But Plaintiffs fail to persuade the Court that his actions in this capacity render him liable for the misconduct alleged in their pleadings.

## III.   Motion for Reconsideration

Lastly, Defendants move for reconsideration (ECF No. 52) of this Court's decision (ECF No. 50) denying their motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure (ECF No. 40).  Defendants sought Rule 11 sanctions, arguing that Plaintiffs' § 1981 discrimination and retaliation claims are frivolous.  (ECF No. 40).  The Court denied Defendants' motion because the

motion failed to reflect that they complied with the "safe harbor" requirements set forth in Rule 11 before filing the motion.  *See* Fed. R. Civ. P. 11(c).

Defendants now present correspondence reflecting that they served their motion on Plaintiffs' counsel on August 25, 2023.  (*See* ECF No. 52-2.)  This was more than 21-days before Defendants filed the Rule 11 motion on September 22. (ECF No. 50.)  Why Defendants did not present proof of their satisfaction of the safe harbor provisions when they filed the motion is perplexing to the Court, as they clearly were aware of these prerequisites.  In any event, it is now evident that the requirements of Rule 11(c) were met.  Nevertheless, this does not "warrant a different outcome," *see* E.D. Mich. LR 7.1(h)(2), because Defendants' motion fails on the merits.

Defendants argued that Plaintiffs' § 1981 claims are frivolous because, according to Defendants, "none of the Plaintiffs ever had an employment contract or contractual relationship with any of the Defendants."  (*See* ECF No. 40 at PageID. 5738 (emphasis removed).)  Defendants appear to be claiming that because Plaintiffs were concededly "at will employees" or worked limited hours, their employment at the Detroit Club was "non contractual."  (*See id.* at 5739.) This argument is, itself, frivolous.

"At-will employment" simply describes a term of the contractual relationship; it does not negate the existence of such a relationship.  In Michigan,

employment contracts may be oral or written.  *See, e.g., Dumas v. Auto Club Ins. Ass'n*, 473 N.W.2d 652, 658 (Mich. 1991); *Drummey v. Henry*, 320 N.W.2d 309, 312 (Mich. Ct. App. 1982) (explaining that at-will employment contracts are not subject to the statute of frauds).  Defendants have acknowledged that Plaintiffs were at-will employees of the Detroit Club, and that they were subject to the Club's employee handbook.  (*See* ECF No. 33 at PageID. 575-80.)

Defendants offer no case law suggesting that it is frivolous for an at-will employee to assert a § 1981 claim.  In support of their motion, Defendants cite *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479-80 (2006), and *Goza v. Memphis Light, Gas & Water Div.*, 398 F. Supp. 3d 303 (W.D. Tenn. 2019).  Neither of these cases support Defendants' arguments, however.

*Domino's Pizza* arose from several contracts between JWM Investments, Inc. ("JWM") and Domino's Pizza, Inc. ("Domino's") for JWM to build four Domino's restaurants in the Las Vegas area.  546 U.S. at 472.  John McDonald, a black individual, was the sole shareholder and president of JWM.  *Id.*  After the first restaurant was finished, Domino's agent refused to execute the certificates for JWM to facilitate its bank financing.  *Id.*  Domino's then persuaded the Las Vegas Valley Water District to change its records to show Domino's, rather than JWM, as the owner of the land JWM acquired for restaurant construction.  *Id.*  McDonald had to go to the Water District to prove JWM's ownership.  *Id.*  The contracts

19

between the two entities ultimately went uncompleted, leading JWM to file for bankruptcy.  *Id*. at 473.

The bankruptcy trustee brought a breach of contract claim against Domino's, which settled.  *Id*.  McDonald then brought a § 1981 claim against Domino's in his personal capacity.  *Id*.  The Supreme Court upheld the dismissal of McDonald's claim because, although *JWM* may have had a contractual relationship enabling it to pursue a § 1981 claim against Domino's, McDonald did not in light of "fundamental corporation and agency law . . . that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts."  *Id*. at 477.

The case says nothing about the rights of an employee—whether at-will or short-term—to sue under § 1981.  Nor does *Goza* support Defendant's argument. Well-established case law in fact reflects that Defendants' argument lacks merit.

As Plaintiffs restated in their response brief:  "Every appellate court that has examined the legislative history of 42 U.S.C. § 1981, as amended in 1991 has concluded that Congress intended the term 'contract' to encompass at-will employment and that § 1981 therefore prohibits employment discrimination." (ECF No. 41 at PageID. 5753 (quoting *Doe v. Matthew 25, Inc.*, 322 F. Supp. 3d 843, 855 (M.D. Tenn. 2018)) (brackets omitted)); *see also Matthew 25*, 322 F. Supp. 3d at 855 (collecting cases); *Walker v. Abbott Labs.*, 340 F.3d 471, 474-75

(7th Cir. 2003) (collecting additional cases); *Aquino v. Honda of Am., Inc.*, 158 F. App'x 667, 673 n.3 (6th Cir. 2005) (acknowledging that a number of Circuits have ruled that § 1981 potentially protects at-will employment, concluding that the question of the applicability of § 1981 to at-will employment disputes rests on whether at-will employment constitutes a contract under state law, and holding that § 1981 does apply to at-will employment relationships in Ohio). District courts within the Sixth Circuit have reached the same conclusion. *See, e.g., Doe*, 322 F. Supp. 3d at 855; *Person v. Progressive Logistics Servs. LLC*, 418 F. Supp. 2d 1006, 1011-12 (E.D. Tenn. 2006); *Burton v. Plastics Rsch. Corp.*, 134 F. Supp. 2d 881, 886-87 (E.D. Mich. 2001). An at-will employment relationship constitutes a contract under Michigan law. *See Burton*, 134 F. Supp. 2d at 887.

For these reasons, the Court rejects Defendants' assertion that Rule 11 sanctions are appropriate based on Plaintiffs' pursuit of their § 1981 claims. Defendants' motion for reconsideration, therefore, is denied.

## IV. Defendants' Motion to Re-Open Discovery and to Expedite Consideration of that Motion

Defendants seek to reopen discovery because they claim that Laurenic improperly accessed the Club's email system after his termination to acquire the documents he provided to Plaintiffs' counsel. Defendants offer the affidavit of Ian Finch, a Senior Ditigal Forensic Examiner, to support their assertion that Laurenic

did so.  Defendants also accuse Plaintiffs' counsel of possibly having been

involved in assisting Laurenic's asserted nefarious conduct.

A court may modify a scheduling order, including extending or reopening,

discovery, when good cause for doing so is established.  Fed. R. Civ. P. 16(b)(4).

"Parties may obtain discovery regarding any nonprivileged matter that is relevant

to any party's claim or defense and proportional to the needs of the case . . .."  Fed.

R. Civ. P. 26(b)(1).  Courts have "broad discretion to manage [their] docket."

*ACLU v. McCreary Cnty.*, 607 F.3d 439, 451 (6th Cir. 2010) (citing *Reed v. Rhodes*,

179 F.3d 453, 471 (6th Cir. 1999)).  Defendants have not established good cause.

The only concrete accusation that Defendants have made and for which they

offer any evidence is that Laurenic improperly accessed Defendants' email system

after his termination.  But that issue is not germane "to any party's claim or

defense" in this case.

Despite injecting a few statements in their motion to reopen discovery and in

their response to Plaintiffs' motion for sanctions implying that the documents were

not located by Defendants because Laurenic moved them, Defendants offer no

concrete evidence to support such an assertion.  Finch does not provide that he

found evidence of such manipulation in his examination of the documents he

received from Defendants.  Notably, his affidavit does not reflect that he conducted

a forensic examination of Defendants' computer systems to detect such

22

manipulation, himself.  This is so, even though Defendants have been aware since early this year of the documents at issue, that they were obtained from Laurenic, and that he was a former management employee. And while any manipulation by Laurenic might be relevant to deciding Plaintiffs' motion for sanctions, it has no bearing on the claims or defenses in this case.

Defendants' suggestion that Plaintiffs' counsel "may too have had some involvement in these potentially illegal activities" is wholly unsupported by any evidence.  Such a baseless allegation fails to demonstrate good cause for reopening discovery.

In short, Defendants fail to show good cause to reopen discovery.  The discovery sought is not relevant to the claims or defenses of the parties to this lawsuit, nor are they relevant to any issue in this lawsuit.  Moreover, the need for additional discovery arises primarily as a result of Defendants' initial failure to produce the documents Laurenic shared with Plaintiffs' counsel.

The Court is denying Defendants' motion to reopen discovery.  Their motion to expedite a decision on the motion is denied as moot.

## V.    Conclusion

In summary, the Court **GRANTS** Plaintiffs' motion to amend their Complaint (ECF No. 48).  Plaintiffs shall file their Second Amended Complaint within fourteen days of this decision.  Defendants' motion for reconsideration

(ECF No. 52) and motion to reopen discovery (ECF No. 58) are **DENIED**, and their motion to expedite a decision on the latter motion (ECF No. 59) is **DENIED AS MOOT**.  Finally, Plaintiffs' motions for sanctions, leave to amend, and to disqualify counsel (ECF No. 49) is **GRANTED IN PART AND DENIED IN PART**.  The Court denies Plaintiffs' request to disqualify Defendants' counsel and to add Emre Uralli as a defendant.  However, the Court awards Plaintiffs the reasonable attorney's fees and costs they incurred responding to Defendants' summary judgment motion, preparing their summary judgment motion, and moving for sanctions.  Within fourteen days of this Opinion and Order, Plaintiffs shall submit documentation to support a reasonable monetary sanctions award.

      **SO ORDERED**.

s/ Linda V. Parker        
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: October 31, 2024