UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIA VICTORIA FERRER,
CHARLES LISÉE, and
MIYA SHANI HOOKS,

Plaintiffs,

Case No. 22-cv-11427

v.                                                    Honorable Linda V. Parker

DETROIT CLUB MANAGEMENT CORP.,
d/b/a The Detroit Club, SUZETTE DAYE,
and LYNN URALLI,

Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

This lawsuit arises from Plaintiffs' employment with the Detroit Club

Management Corporation, which does business as The Detroit Club ("Detroit

Club" or "Club"). Defendants are the Club, its Owner and President Lynn Uralli,

and the former front office manager Suzette Daye. In a Second Amended

Complaint filed on November 1, 2024, Plaintiffs assert the following claims

against Defendants, unless otherwise noted:

(I)     Retaliation in violation of 42 U.S.C. § 1981;

(II)    Retaliation in violation of Title VII of the Civil Rights Act of
        1964 ("Title VII"), by Ferrer and Lisée against the Detroit Club;

(III)   Retaliation in violation of Michigan's Elliot-Larsen Civil Rights

Act ("ELCRA");

(IV)   Hostile Work Environment under Title VII, by Ferrer and Lisée
against the Detroit Club;

(V)    Hostile Work Environment under ELCRA;

(VI)   Race discrimination in violation of 42 U.S.C. § 1981;

(VII)  Race discrimination in violation of Title VII, by Ferrer and
Lisée against the Detroit Club; and

(VIII) Race discrimination in violation of ELCRA.

(ECF No. 63.)

The matter is presently before the Court on the parties' cross-motions for

summary judgment pursuant to Federal Rule of Civil Procedure 56(c), which are

fully briefed.  (ECF Nos. 69-70.)  Defendants seek summary judgment as to all of

Plaintiffs' claims.  Plaintiffs seek summary judgment as to only their retaliation

claims.[1]  Finding the facts and legal arguments adequately presented in the parties'

---

[1] In their motion, Plaintiffs focus on their retaliation claims based on a "direct evidence" theory.  (*See, e.g.*, ECF No. 70 at PageID.8475, 8495.)  While Plaintiffs assert that, "[i]n the alternative, [they] have presented enough circumstantial evidence to demonstrate their claims under the *McDonnell Douglas* framework[,]" (*id*. at PageID.8496), they do not set forth any arguments for why they are entitled to summary judgment if direct evidence is lacking.  "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d, 989, 995-96 (6th Cir. 1997) (cleaned up).  Thus, the Court is not evaluating whether Plaintiffs are entitled to summary judgment based on circumstantial evidence, although it evaluates the claims under the *McDonnell Douglas* framework in connection with Defendants' motion.

2

filings, the Court is dispensing with oral argument with respect to both motions. *See* E.D. Mich. LR 7.1(f).  For the reasons discussed, the Court is granting in part and denying in part both motions.

## I.    Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, "[t]he party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party."  *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Liberty Lobby*, 477 U.S. at 248).  The non-movant's evidence generally must be accepted as true and "all justifiable inferences" must be drawn in the non-movant's favor.  *Liberty Lobby*, 477 U.S. at 255.

These standards "do not change" with the filing of cross-motions for summary judgment.  *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th

Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).  "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id*. (quoting *Taft Broad.*, 929 F.2d at 248).

## II.    Factual Background

### A.    The Club

The Detroit Club is a private establishment in downtown Detroit, although most of the areas within the Club are open to nonmembers.  (ECF No. 69-2 at PageID.7139.)  The Club contains three bars (the Library Bar, Bohemia, and the Cigar Lounge), a restaurant (Bohemia), a hotel with twenty-one rooms, and a spa.  (*Id.* at PageID.7117.)  Uralli is the Club's Owner and President.  (*Id*. at PageID.7104, 7113.)

The Club has a dress code for its patrons, which is posted in the Club and described, along with the Club's other policies, on paperwork provided to overnight guests.  (*Id.* at PageID.7140-41; ECF No. 69-3; ECF-No. 69-4.)  Before 6:00 p.m., the dress is "Smart Casual," which may include denim and collared shirts.  (*Id*.)  After 6:00 p.m., the dress is "Business Casual or better," which "includes collared shirts, including turtlenecks, slacks or skirt[s] with blouse or sweater."  (*Id*.)  Sneakers, ripped jeans, hoodies, work boots and baseball caps are not allowed.  (*Id.*)  Team sport apparel is generally not allowed unless it is a "game

4

day." (ECF No. 69-2 at PageID.7141.) Overnight guests checking in or out of the hotel and individuals going to the spa are not required to be in dress code. (*Id.*; ECF No. 69-19 at PageID.8155.)

Some individuals who have worked at the Club, such as Plaintiffs and former Assistant General Manager Colleen Kelley, believe the dress code is enforced differently based on a patron's race, particularly by Uralli and Daye. (ECF No. 69-9 at PageID.7503-05, 7573-74; ECF No. 70-30 at PageID.9133-43, 9145, 9149-51.) According to Kelley, Uralli asked front desk staff to be "more firm with [the] dress code" and "not let street rats or hood rats to come in." (ECF No. 69-9 at PageID.7553-54.) Kelley saw Daye and Uralli deny Black guests entry based on their dress, when they were dressed similarly to Caucasian guests allowed entry. (*Id.* at PageID.7573-78.) Guests also complained about being treated differently based on their race. (ECF No. 70-4; ECF No. 71-5; *see also* ECF No. 69-10 at PagID.7644-45; ECF No. 69-16 at PageID.8008.)

Daye managed the Club's front office from 2018 until September 2022. (ECF No. 69-19 at PageID.8140-41.) In that position, Daye supervised the front desk staff, although she did not have the authority to hire or fire employees. (*Id.* at PageID.8144, 8151.) Daye was supervised by the Club's former General Manager, Chance Armstrong, until his departure in May 2022, then Uralli was her only supervisor. (*Id.* at PageID.8145; ECF No. 69-16 at PageID.7992.)

### B.   Plaintiff Miya Hooks

Hooks, who is Black, began working at the Club as a part-time server on

October 1, 2021.  (ECF No. 69-6; ECF No. 69-7 at PageID.7450.)  Former Service

Manager Charles Howard hired Hooks while Uralli was out of town.  (ECF No.

35-23 at PageID.3405, 3415; ECF No. 34-28 at PageID.2580.)  Shortly after Hooks

was hired, Howard told her that Uralli asked if she was "black black or white

black" (ECF No. 69-7 at PageID.7386; ECF No. 70-6 at PageID.8516), although at

his deposition, Howard did not recall this statement (ECF No. 69-21 at

PageID.8353).

On November 21, 2021, Uralli instructed Assistant General Manager

Colleen Kelley to terminate Hooks.  (ECF No. 69-2 at PageID.7181-82; ECF No.

69-6.)  According to Uralli, Hooks was fired because she physically threatened

Uralli and Club employee Anita Walker.  (*Id.* at PageID.7182)  Kimberly Stafford,

who worked at the Club during Hooks' employment and is currently head

housekeeper, heard Hooks' threats the previous day and reported them to Uralli.

(*Id.*; ECF No. 72-14.)

Kelley did not remember Uralli saying that Hooks threatened Walker when

Uralli instructed her to terminate Hooks.  (ECF No. 34-26 at PageID.2499.)  Kelley

testified that, instead, Uralli was angry because "a person [Uralli] trusted," who

was not identified to Kelley, claimed that Hooks called Uralli racist and

6

"threatened to take Mrs. Uralli out back . . .." (ECF No. 69-9 at PageID.7509.)
Kelley questioned Club staff, and no one corroborated what Uralli claimed Hooks
said, and when Kelley called Hooks to terminate her, Hooks denied making the
alleged statements. (*Id*. at PageID.7543-44.)

During her employment, Hooks complained to Armstrong and Kelley about
the discriminatory treatment of Black Club guests. (ECF No. 69-9 at PageID.7569;
ECF No. 69-15 at PageID.7996, 8007, 8021.) While Defendants claim that Uralli
was unaware of any complaints by Hooks of disparate treatment or racism at the
Club, Armstrong testified otherwise, indicating that he spoke directly with Uralli
about Hooks' complaints. (ECF No. 69-16 at PageID.7996; 8020-21.)

### C.    Plaintiff Maria Victoria Ferrer

Ferrer, who is Latina, began working part-time at the Club's front desk on
March 17, 2022. (ECF No. 69-6; ECF No. 69-10 at PageID.7638.) Daye was
Ferrer's direct supervisor. (ECF No. 69-19 at PageID.8144.) Ferrer was
terminated by Armstrong, at Uralli's direction, on April 23, 2022. (ECF No. 70-23
at PageID.8919-20; ECF No. 69-10 at PageID.7702.) The reason provided for her
termination was "insubordination" due to "arguing [with management] and
breaking protocol and policy . . .." (ECF No. 69-15 at PageID.7981.)

Armstrong was unaware of any Club policies broken by Ferrer, and he could
not identify an instance where she argued with him. (ECF No. 70-23 at

PageID.8921-22.)  Ferrer was not told that she was terminated for violating Club

policies; instead, she was told she was "not a good fit."  (ECF No. 69-10 at

PageID.7704, 7710.)

At her deposition in this matter, Uralli testified that Ferrer was terminated

because of an incident on April 23, 2022, when Ferrer allowed a couple to enter the

Club two times to use the restroom.  (ECF No. 69-2 at PageID.7256-59.)  Uralli

stated that this was against Club policy.  (*Id.*)  The couple consisted of Kody Hook,

who is of mixed race, and his girlfriend, who is Black.  (*Id.*)

While Hook was standing in the lobby waiting for his girlfriend to use the

restroom, Uralli came down the stairs and asked Ferrer whether they were guests.

(ECF No. 69-10 at PageID.7690-91; ECF No. 70-29 at PageID.9118.)  When

Ferrer said no, Uralli criticized her for "letting street trash" or "street rats" into the

Club.  (*Id.*)  Hook let Uralli know that he heard her comment.  (*Id.*)  The Club's

surveillance camera captured the exchange, although not all of the dialogue can be

clearly heard.  (ECF No. 69-13 ("Video 10").)

Uralli testified that Ferrer laughed when Uralli confronted her about letting

the couple use the bathroom and said that while she did not agree with Uralli, "if

that's the way you want, that's what I'll do."  (ECF No. 69-2 at PageID.7258.)

Ferrer made it clear that she understood the policy but believed it was a racist

issue.  (ECF No. 69-10 at PageID.7695-96.)  Ferrer had not been told previously

that the Club bathrooms were private, and she believed they were open to the public.  (*Id.* at PageID.7621.)  Ferrer had seen Caucasian people use the bathrooms without being questioned.  (*Id.* at PageID.7741.)  Assistant General Manager Jennifer Thomason testified that limiting access to the bathrooms to Club guests is not a written Club policy, "just kind of standard."  (ECF No. 69-23 at PageID.8433.)

After the incident, Uralli texted Daye: "I hate her," in reference to Ferrer. (ECF No. 71-4 at PageID.9232; ECF No. 69-2 at PageID.7263-64; ECF No. 69-19 at PageID.8257-58.)  About an hour and a half later, Daye texted Uralli:  "You are right.  She [Ferrer] needs to go. I'm sure tonight will be her last."  (*Id.*)  Uralli asked, "Now what?"; Daye responded:  "It's the racist thing.  It's just stupid."  (*Id.*) Daye explained that she was referring to Ferrer's allegations of racism at the Club. (ECF No. 69-19 at PageID.8259.)

A couple of weeks before Ferrer's termination, Uralli had issued a written warning to her for an incident on April 7.  (ECF No. 69-14.)  Uralli completed the Corrective Action Form a few days later, providing as the reason for the warning: "misinform guests."  (*Id.*; ECF No. 69-2 at PageID.7224.)  On the form, Uralli wrote in the "situation" section:  "Please follow [d]ress code rules, unsure why you accused guest of being intoxicated, and if so they should not have been given keys."  (ECF No. 69-14.)

Uralli testified that she left the form at the front desk for Daye or Thomason to give to Ferrer, but Ferrer refused to acknowledge the form by signing it.  (ECF No. 69-2 at PageID.7224.)  Uralli, therefore, wrote "refused" on the form and put it in Ferrer's employment file.  (*Id*.)  Daye did not present Uralli's write up to Ferrer. (ECF No. 69-19 at PageID.8229-30, 8243-44.)  In fact, when presented with it at her deposition, Daye testified she had never seen it before.  Thomason testified that she did not really work with Ferrer, as Thomason was a beverage manager and Ferrer worked at the front desk.  (ECF No. 69-23 at PageID.8409.)  Ferrer testified that she was never informed of this written discipline.  (*See* ECF No. 69-10 at PageID.7621-22.)

The warning arose from an incident involving a Black man and woman, who Ferrer checked in as hotel guests.  (ECF No. 69-2 at PageID.7225.)  This incident also was captured on the Club's surveillance camera.  (ECF No. 69-13 ("Video 5").)  Thus, the Court describes the incident as depicted in the video and described by the parties, to the extent the parties' versions are not contradicted by the recording.  *See Schumate v. City of Adrian*, 44 F.4th 427, 438 (6th Cir. 2022). "Any relevant gaps or uncertainties left by the video[]" will be viewed in the light most favorable to the non-moving party.  *Id*.

Ferrer checked the couple into the hotel, and informed them of the Club's policies, including the dress code.  (ECF No. 69-13.)  Daye approached the front

desk, welcomed the couple, instructed them about the thermostats in the hotel rooms, and then offered them champagne. (*Id.*)  Daye then walked away from the front desk, briefly returned, and then walked away again. (*Id.*)  The male guest asked for clarification about the dress code, which Ferrer explained. (*Id.*)  Daye returned to the front desk area shortly before the video ends. (*Id.*)

Daye claims that at some point, while she was away from the front desk area, Uralli called her and said she was watching the security camera, and it looked like the woman was harassing Ferrer. (ECF No. 69-19 at PageID.8195-96.)  When Daye returned to the front desk and asked if there was a problem, the woman "started telling [Daye] off[,]" accusing her of being racist. (*Id.*)

According to Ferrer, the man was wearing a durag, and after they checked in and left for their room, Daye approached Ferrer and asked her why she had allowed them to check in because they were out of dress code. (ECF No. 69-10 at PageID.7642.)  Ferrer pointed out that Club policy allows guests to check in out of dress code. (*Id.*)  Daye responded that "Lynn [Uralli] saw them on the camera and he's wearing a doo rag [sic] and you shouldn't have let them check in." (*Id.*)  Ferrer felt that "it was a race thing" and that Uralli and Daye were "being extremely racist." (*Id.*)

Ferrer testified that the couple subsequently returned to the front desk, and the woman was "a little upset" about the dress code but "not rude." (*Id.* at

11

PageID.7643.)  Daye intervened and stepped right in front of the lady, "in her face," and asked if "we have a problem here." (*Id.*)  The woman told Daye that she was not thrilled about the dress code, and Daye responded that it is Club policy and if she did not like it, she could leave. (*Id.*)  Ferrer felt that the couple was being harassed because of their race. (*Id.*)  The couple decided to leave and requested a refund. (*Id.* at PageID.7634-44.)

The following day, Ferrer told Daye that she felt Daye's treatment of the couple amounted to racial harassment. (*Id.* at PageID.7654.)  Daye told Ferrer to talk to Uralli. (*Id.* at PageID.7655.)  Ferrer did. (*Id.* at PageID.7664-65; ECF No. 69-2 at PageID.7225-31.)  When Ferrer told Uralli that she felt the incident had been discriminatory, Uralli asked Ferrer if she "thought [she] was black." (ECF No. 69-10 at PageID.7665.)  Uralli denies saying this. (ECF No. 69-2 at PageID.7228.)  Uralli testified, however, that Ferrer saw racism everywhere. (ECF No. 69-2 at PageID.7234.) Uralli described Ferrer's accusations as "wreaking havoc," which "frustrated" her. (*Id.*)

Uralli decided to write-up Ferrer for the incident, concluding that she should have informed the couple of the dress code so Daye did not have to intervene. (*Id.* at PageID.7235.)  Uralli also wrote-up Ferrer for letting the couple check-in despite noting on the guest folio that the woman was intoxicated. (*Id.*)

12

### D.   Plaintiff Charles Lisée

Lisée, who is Caucasian, began working part-time at the Club as a bartender on November 18, 2021.  (ECF No. 69-6; ECF No. 63 at PageID.6812, 6818.) Lisée felt that Black guests at the Club were treated differently than Caucasians. (ECF No. 69-11 at PageID.7796, 7817-21.)  Lisée complained to Armstrong about this unequal treatment.  (*Id.* at PageID.7837-38; ECF No. 69-16 at PageID.8009-11, 8015-16, 8023-25.)  He also complained to Thomason.  (ECF No. 69-23 at PageID.8412, 8438-39.)  On April 9, 2022, Lisée sent an email to Armstrong concerning "the ongoing racism that non-Caucasian guests are brutalized with when entering the club."  (ECF No. 71-3.)  Armstrong forwarded the message to Uralli and Thomason.  (ECF No. 49-2 at PageID.5940.)

On April 25, 2022, Lisée voluntarily resigned from the Club through a letter outlining and complaining about the race discrimination he witnessed at the Club, which he believed had not been addressed.  (ECF No. 70-15.)  The letter was sent via email to Armstrong and copied to Thomason.  (*Id.*)  Uralli also saw the letter. (*See* ECF No. 69-2 at PageID.7277; ECF No. 69-16 at PageID.8025-26.)  Lisée also posted the resignation letter to his Facebook page, which Uralli knew about. (ECF No. 69-2 at PageID.7284-85.)

Attempting to get Lisée to remove his post, Uralli sent him a text message on April 26.  (*Id.*)  In her text, Uralli threatened to "destroy" Lisée.  (ECF No. 63-5

at PageID.6847; ECF No. 69-2 at PageID.7284-85.)  She told Lisée that he "would pay for the attempt of defaming [her] business" and that "the first thing to go will be a real estate license."  The next day, Thomason shared a text she received from Lisée with Uralli, in which Lisée explained that he could no longer "be associated with bigotry."  (ECF No. 71-6 at PageID.9234.)  Uralli texted back: "He's insane. You should call your friend the broker, Charles is going down." (*Id.*)  Thomason agreed to call him the next day, although she never did.  (*Id.*; ECF No. 69-23 at PageID.8459.)

## III.   Applicable Law & Analysis

### A.   Individual Liability as to Uralli and Daye

Citing *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir. 2000), Defendants claim that Uralli and Daye are entitled to summary judgment on all of Plaintiffs' claims as only "employers" can be held liable under Title VII, § 1981, and ELCRA.  It is well-established in the Sixth Circuit that an individual employee or supervisor "who does not otherwise qualify as an employer" cannot be held personally or individually liable under Title VII[.]"  *Id.* at 794 (quoting *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404 (6th Cir. 1997)).  Consistent with this caselaw, Plaintiffs do not assert any Title VII claims against Uralli or Daye.  (*See generally* ECF No. 63.)  While Plaintiffs do assert § 1981 and ELCRA claims against them,

neither *Morris* nor *Wathen* analyzed individual or supervisory liability under those statutes.

Under ELCRA, a non-employer defendant can be liable if the individual "affected or controlled a term, condition, or privilege of the [plaintiff]'s employment." *McClements v. Ford Motor Co.*, 702 N.W.2d 166, 174-75 (Mich. 2005); *see also Casias v. Wal-Mart Stores, inc.*, 695 F.3d 428, 434 (6th Cir. 2012) (holding that an individual can be held liable under Michigan's civil rights statute if the individual "is responsible for making personnel decisions"). The evidence supports Uralli's individual liability under the statute, but Plaintiffs fail to point to evidence supporting Daye's liability. The undisputed evidence reflects that Daye did not have the authority to hire, fire, or independently discipline employees. (*See* ECF No. 69-19 at PageID.8151-52.) Thus, the Court is dismissing Plaintiffs' ELCRA claims against Daye.

"[T]he law is clear that individuals may be held liable for violations of § 1981." *Jones v. Cont'l Corp.*, 789 F.2d 1255, 1231 (6th Cir. 1986) (collecting cases); *see also Phillips v. Fashion Inst. of Tech.*, No. 23-375, 2024 WL 1005500, at *2 (2d Cir. Mar. 8, 2024) (citing *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)). Thus, Defendants' argument does not support the dismissal of Plaintiffs' § 1981 claims against Uralli or Daye.

Nevertheless, as Plaintiffs' acknowledge, a defendant's liability under § 1981 must be premised on the individual's personal involvement in the unlawful conduct. *Wagner v. Merit Distrib.*, 445 F. Supp. 2d 899, 909 (W.D. Tenn. 2006) (collecting cases). There is no evidence that Daye was personally involved in the unlawful conduct underlying Lisée's or Hooks' § 1981 claims. Therefore, the Court is sua sponte dismissing those claims against Daye. There is, however, evidence from which a jury could reasonably conclude that Daye was personally involved in the conduct underlying Ferrer's § 1981 claims. Daye communicated with Uralli concerning Ferrer's complaints of racism, including on the day of Ferrer's termination. In fact, Daye directly told Uralli that Ferrer "needs to go." Daye's comments about Ferrer's national origin also could suggest a discriminatory animus.

### B.     § 1981

Defendants move for summary judgment on Plaintiffs' § 1981 claims, arguing that the statute only protects the right to contract, and Plaintiffs cannot identify an impaired "contractual relationship" because they were at-will employees. Defendants raised the same challenge to Plaintiffs' § 1981 claims in earlier motions. (*See* ECF Nos. 49, 52.) The Court rejected Defendants' argument in a decision issued on October 31, 2024. (*See* ECF No. 62 at PageID.6803-06.)

16

The analysis in that decision is adopted here, as Defendants make no new

arguments warranting further discussion.

### C.    Race Discrimination

Plaintiffs bring race discrimination claims against Defendants under § 1981

and ELCRA (Counts VI and VIII, respectively).  Ferrer and Lisée assert a race

discrimination claim under Title VII against the Club, only (Count VII).  These

statutes, in varying language, make it "an unlawful employment practice for an

employer . . . to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-

2(a)(1); *see also* Mich. Comp. Laws § 37.2202(1)(a) ("[a]n employer shall

not . . . [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate

against an individual with respect to employment, compensation, or a term,

condition, or privilege of employment, because of religion, race, color, national

origin, age, sex, height, weight, or marital status"); 42 U.S.C. § 1981 (protecting

against the impairment of the right to "make and enforce contracts" which

"includes the making, performance, modification, and termination of contracts, and

the enjoyment of all benefits, privileges, terms, and conditions of the contractual

relationship").

Claims brought under these three statutes are analyzed under the same evidentiary framework. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652-53 (6th Cir. 2012) (citations omitted); *Thompson v. City of Lansing*, 410 F. App'x 922, 934 (6th Cir. 2011) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999)). A plaintiff may establish a claim of discrimination through direct or circumstantial evidence. *Ondricko*, 689 F.3d at 648-40 (citing *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004)). "In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Id.* at 650 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). In circumstantial evidence cases, the burden-shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. U.S. 792 (1973), applies. *See id*. at 653.

### 1.    Direct Evidence of Race Discrimination

"Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Ondricko*, 689 F.3d at 649, 650 (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in

18

order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Jacklyn*, 176 F.3d at 926.

Plaintiffs present evidence from which a reasonable jury could conclude that Uralli engaged in racism towards Black employees and patrons which constitutes direct evidence that Hooks' termination may have been racially motivated.[2]  *See DiCarlo*, 358 F.3d at 416 (holding that slurs by an individual with decision-making authority regarding the plaintiff's origin were direct evidence of national-origin discrimination); *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1249 (6th Cir. 1995) (holding that racist comments by the plaintiff's managers "constitute[d] direct evidence that plaintiff's termination may have been racially motivated," notwithstanding that the comments were temporally removed from the termination decision and did not address the plaintiff in particular).[3]  While Uralli's

---

[2]  Having found direct evidence, "the burden of both production and persuasion shifts to [Defendants] to prove that [they] would have terminated [Hooks] even if [they] had not been motivated by impermissible discrimination." *Ondricko*, 689 F.3d at 650 (quoting *Nguyen*, 229 F.3d at 563).  The Court evaluates whether Defendants satisfy this burden below, in discussing Plaintiffs' retaliation claims.

[3] There is Sixth Circuit precedent in tension with *DiCarlo* and *Talley*.  *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (holding that a manager's age-biased statements outside the context of the decision to discharge the plaintiff were not direct evidence of age discrimination).  Other panels of the Sixth Circuit have continued to rely on *DiCarlo* and *Talley*, however, as these decisions preceded *Rowan* and "reported panel opinions are binding on

inconsistent enforcement of the dress code and some of her statements arguably require a factfinder to draw an inference to conclude that Hooks' termination was motivated by racial prejudice, that is not the case for several of Uralli's other purported statements.  For example, there is evidence that Uralli rejected job candidates saying they were "too black," felt that too many Blacks were being hired, and described two Blacks hostesses as "ni**er pigs."  (ECF No. 63-1.)  "No inference is required to glean from those statements that [Uralli] harbored racial animus towards African Americans."  *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012).[4]

Ferrer and Lisée are not Black, however.  They are Latina and Caucasian, respectively.  Plaintiffs offer no direct evidence of a discriminatory animus towards members of those classes.  Thus, Ferrer and Lisée must satisfy the *McDonnell Douglas* burden-shifting framework to prove their race discrimination claims.

---

subsequent panels."  *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 526 (6th Cir. 2007) (quoting 6 Cir. R. 206(c)) (brackets removed). This Court will follow their lead.

[4] Even if direct evidence is lacking, Hooks can establish a prima facie case of discrimination.  Defendants concede that she can establish the first three prongs (*see* ECF No. 69 at PageID.7083), and Hooks presents evidence giving rise to an inference of unlawful discrimination.

## 2.   Prima Facie Case of Discrimination

Under the *McDonnell Douglas* framework, Ferrer and Lisée must first

present a prima facie case of unlawful discrimination.  To do so, they must satisfy

four elements: "(1) they were members of a protected class; (2) they suffered

adverse employment actions; (3) they were qualified for their positions; and (4)

they were replaced by someone outside the protected class or were treated

differently than similarly situated, non-protected employees." *Peeples v. City of

Detroit*, 891 F.3d 622, 634 (6th Cir. 2018) (citing *DiCarlo*, 358 F.3d at 415).  Even

if the Court assumes that Lisée satisfies the first three requirements, there is no

evidence that he was replaced by a non-Caucasian individual or that he was treated

differently than similarly situated, non-Caucasian employees.[5]  The Court

---

[5] Citing *Johnson v. University of Cincinnati*, 215 F.3d 561 n.5, 574-75 (6th Cir. 2000), Plaintiffs assert that Title VII and § 1981 forbid discrimination on the basis of advocacy for a protected party.  In *Johnson*, the court recognized that Title VII "protect[s] individuals who are the victims of discriminatory animus towards third persons with whom the individuals associate."  *Id*. at 574 (quoting *Tetro v. Popham*, 173 F.3d 988, 994 (6th Cir. 1999)).  The *Johnson* court also discussed whether a Caucasian plaintiff has standing to sue when the plaintiff was discharged in alleged retaliation for protesting discriminatory conduct toward a black co-worker.  *Id*. (citing *Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266, 1270 (6th Cir. 1977)).  However, neither Lisée nor Ferrer claim that they were subject to an adverse action because they associated with members of a recognized protected class.  And to the extent they claim that they were retaliated against for protesting the alleged discriminatory conduct toward protected individuals, that is the subject of their separate retaliation claims.

concludes that Defendants are therefore entitled to summary judgment on Lisée's race discrimination claims.

Defendants concede that Ferrer can establish the first three prongs of her prima facie case.  (ECF No. 69 at PageID.7083.)  Defendants contend, however, that she cannot satisfy the fourth prong.  As to the fourth prong, Ferrer does not claim that she was treated differently than non-Latino employees.  There is a disputed issue of fact, though, as to whether she was replaced by someone who was either Caucasian (according to Ferrer) or Black (according to Defendants).  Either way, this was someone outside Ferrer's protected class.  Thus she demonstrates a prima facie case of discrimination.

### D.    Retaliation

Title VII, § 1981, and ELCRA prohibit retaliation against an individual who, as relevant here, has opposed any practice made unlawful under these statutes.  *See Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343 (6th Cir. 2021) (quoting 42 U.S.C. § 2000e-3(a) and Mich. Comp. Laws § 37.2701); *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 447 (2008) (analyzing 42 U.S.C. § 1981).  For example, under Title VII's opposition clause, it is unlawful for "an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . .." 42 U.S.C. § 2000e-3(a).  ELCRA provides that one shall not "[r]etaliate or discriminate

against a person because the person has opposed a violation of this act." Mich.

Comp. Laws § 37.2701(a). One example of protected activity is "complaining to

anyone (management, unions, other employees, or newspapers) about allegedly

unlawful practices[.]" *Jackson*, 999 F.3d at 344-45 (quoting *Niswander v.*

*Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008)).

"While the plaintiff's allegations of protected activity do not need to 'be

lodged with absolute formality, clarity, or precision,' the plaintiff must allege more

than a 'vague charge of discrimination.'" *Id.* (quoting *Yazdian v. ConMed*

*Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015)). "[M]agic words" are

not required. *Crawford v. Chipotle Mexican Grill, Inc.*, 773 F. App'x 822, 829 (6th

Cir. 2019). Yet the language used must "be enough, in a specific factual context, to

convey the accusation and its basis." *Id*.

Like discrimination claims under these statutes, retaliation claims can be

proven through direct or circumstantial evidence. *See Weigel v. Baptist Hosp. of E.*

*Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002). Absent direct evidence of a retaliatory

motive, a plaintiff claiming retaliation must proceed under the *McDonnell Douglas*

framework. *Id.* at 381-82.

### 1. Direct Evidence of Retaliation

As direct evidence to support Hooks' retaliation claim, Plaintiffs point to the

evidence that Uralli terminated Hooks for calling Uralli "racist." Sixth Circuit

caselaw, however, compels the conclusion that calling someone a racist is not protected activity because "the allegation is not that the [individual] is engaging in [an] unlawful employment practice, but that [the individual] has a racial intolerance." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (determining that the plaintiff's complaint about a single incident where supervisor and colleague made sexual joke was not protected activity because "[n]o reasonable person could have believed that the single incident . . . violated Title VII's standard" for a hostile work environment); *Cooks v. Ford Motor Co.*, No. 3:21 CV 1368, 2023 WL 3740302, at *9 (N.D. Ohio May 31, 2023) (characterizing as "at most a vague charge of discrimination" the plaintiff's calling another employee racist "for believing all black people look the same" after that employee docked the plaintiff's pay for leaving his shift early when the plaintiff denied leaving early); *Childers v. Gen. Motors LLC*, No. 16-cv-14428, 2019 WL 630274, at *7 (E.D. Mich. Feb. 14, 2019) (finding that registering an "isolated complaint" about a single "racist remark" was not protected activity).

The Court is unclear as to what direct evidence Plaintiffs are citing in support of Ferrer's retaliation claim. They refer to the close proximity between Ferrer's termination and her complaints about the discriminatory treatment of Black guests, but this is not direct evidence. *See Trzeciak v. Vill. of LaGrange*, No.

24

01 C 4977, 2003 WL 1193319, at *9 (N.D. Ill. Mar. 13, 2003) (collecting cases) (finding that "[t]emporal proximity as proof of a causal relationship is generally considered to be circumstantial, not direct, evidence."); *see also Lindsay v. Yates*, 578 F.3d 407, 419 (6th Cir. 2009) (identifying "suspicious timing" as an example of circumstantial evidence); *Sullivan v. Ohio State Univ.*, 764 F. Supp. 3d 652, 666 (S.D. Ohio 2025) (explaining that "[t]emporal proximity between the protected conduct and the adverse action is paradigmatic circumstantial evidence in the retaliation context"). The belief or opinion of other individuals that Uralli terminated Ferrer due to Ferrer's complaints about racism at the Club is not direct evidence. *See Siegner v. Twp. of Salem*, 654 F. App'x 223, 230 (6th Cir. 2016) (citing *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006)) (finding that township supervisor's "opinion" that the township board of trustees refused to consider the plaintiff's application because of his EEOC charge was not direct evidence, as "mere personal beliefs, conjecture, and speculation" are insufficient evidentiary support to show a retaliatory motive).

Turning to Lisée, Plaintiffs allege in their Amended Complaint that Lisée was constructively discharged in retaliation for his protected activity (*see* ECF No. 63 at PageID.6826 ¶ 70), but that he also experienced retaliation following his

separation from the Club (*id.* at PageID.6811 ¶ 1).[6]  There is direct evidence to

support the claimed post-employment retaliation.  Uralli admits that she sent the

text message to Lisée, in which she threatened to destroy him and go after his real

estate license, because he complained about race discrimination at the Club.  (ECF

No. 69-2 at PageID.7285.)

Defendants assert that this is not direct evidence because "there is no

evidence that any harm emotionally asserted in a text message ever came to Lisée

and he has clearly not been dissuaded from making allegations of discrimination as

evidenced by this very litigation."  (ECF No. 72 at PageID.10398.)  However, the

question is not whether the conduct dissuaded *Lisée* but whether it would dissuade

---

[6] Defendants devote significant space in their brief in response to Plaintiffs' motion attacking Plaintiffs' reliance on *Burlington Northern and Santa Fe Railway Company v. White*, 548 U.S. 52 (2006), to support a post-employment retaliation claim.  (*See* ECF No. 72 at PageID.10397-98.)  Defendants contend that "Lisée has vastly over read this decision to an unfathomable end."  (*Id.* at PageID.10398.)  The Court disagrees, as the Supreme Court expressly held in *Burlington* that "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."  548 U.S. at 67.  Defendants' extensive argument is even more surprising, as Plaintiffs cited *Burlington* only to support that, in the retaliation context, a plaintiff needs to show a "materially adverse" action in response to protected activity rather than the "adverse employment action" required for a discrimination claim.  (*See* ECF No. 73 at PageID.11286.)  Plaintiffs cite *Robinson v. Shell Oil Company*, 519 U.S. 337 (1997), to support their assertion that Title VII's anti-retaliatory provision protects former employees.  (ECF No. 73 at PageID.11286.)  This is precisely what *Robinson* held.  519 U.S. at 346.  ELCRA's antiretaliation provision has been similarly interpreted.  *See, e.g., White v. Dep't of Transp.*, 964 N.W.2d 88, 97 (Mich. Ct. App. 2020).

26

*a reasonable person* from engaging in protected conduct.  *See Burlington N. &*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) ("We refer to reactions of a

reasonable employee because we believe that the provision's standard for judging

harm must be objective.").  Defendants have not argued that a reasonable person

would not be deterred by Uralli's threats.

This evidence, which is not disputed, "compels the conclusion that

retaliatory animus played a part" in Uralli's actions.  *Weigel*, 302 F.3d at 383

(citing *Jacklyn*, 176 F.3d at 926).  Where a plaintiff has shown direct evidence of

retaliation, the burden shifts to the defendant to show it would have made the same

decision absent the impermissible motive.  *See Weigel*, 302 F.3d at 382 (citing

*Jacklyn*, 176 F.3d at 926).  Defendants do not attempt to satisfy this burden with

respect to Uralli's text to Lisée after he resigned.  Thus, the Court concludes that

Lisée is entitled to summary judgment on his retaliation claims.[7]

### 2.      Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, Plaintiffs must demonstrate the

following: (1) they engaged in protected activity; (2) Defendants were aware of the

protected activity; (3) Defendants took an action that was materially adverse to

Plaintiffs; and (4) there is a causal connection between Plaintiffs' protected activity

---

[7] As already discussed, Uralli may be held liable for this retaliation under ELCRA
and § 1981.  Daye, however, cannot.

and Defendants' action(s). *Jackson*, 999 F.3d at 343-44 (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). As discussed in the preceding section, "[a]n action is materially adverse if it 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Queen v. City of Bowling Green*, 956 F.3d 893, 903 (6th Cir. 2020) (quoting *Burlington*, 548 U.S. at 68). At the prima facie stage, the burden of demonstrating a causal connection "is not onerous[.]" *Jackson*, 999 F.3d at 349 (quoting *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020)).

Defendants argue that Hooks' cannot establish a prima facie case of retaliation because Uralli, the sole decisionmaker, was unaware of her complaints about discrimination at the Club. There is a genuine issue of material fact concerning Uralli's knowledge of Hooks' protected activity, however. Armstrong testified that he spoke directly to Uralli about Hooks' complaints. Accordingly, Hooks demonstrates a prima facie case of retaliation in connection with her termination from the Club.

Defendants do not challenge Ferrer's ability to demonstrate a prima facie case of retaliation. (*See* ECF No. 69 at PageID.7089-90.)

They contend that Lisée cannot satisfy the third element of his prima facie case because the evidence does not support his constructive discharge. "A constructive discharge occurs when 'working conditions would have been so

28

difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 814 (6th Cir. 2020) (quoting *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008)).  The plaintiff also must demonstrate that the employer intended to oust him."  *Id.* (citing *Talley*, 542 F.3d at 1107).  "In other words, the employer must have created an objectively intolerable work environment to deliberately force [the plaintiff] to resign."  *Id.* (citing *Agnew v. BASF Corp.*, 286 F.3d 307, 309-10 (6th Cir. 2002)).

Lisée claims that he felt compelled to resign due to the racism at the Club. Plaintiffs ask, "how many times was Lisée required to complain in the face of inaction before he had no choice but to resign?  Was Lisée required to tolerate a racist workplace?"  (ECF No. 71 at PageID.9213.)  Plaintiffs do not cite a single case discussing a constructive discharge asserted, successfully or otherwise, by an individual in Lisée's shoes—that is, an observer of the mistreatment of others as opposed to the target of the mistreatment.  In any event, Plaintiffs fail to address Defendants' evidence that there was *no intent to oust Lisée*.  Thus, Lisée fails to demonstrate a prima facie case of retaliation in connection with his departure from the Club.

### E.   Pretext

Even if Plaintiffs demonstrate prima facie cases of discrimination or

retaliation, Defendants maintain that their claims fail because Hooks and Ferrer

were terminated for legitimate reasons and Lisée voluntarily resigned.  Defendants'

stated reason for terminating Hooks was her threat to physically harm Uralli and

Walker.  Their stated reasons for terminating Ferrer was "insubordination"—more

specifically, arguing with management and supervisors and breaking protocol by

allowing Kody Hooks and his girlfriend to use the Club's bathroom.  Plaintiffs can

show that these reasons were pretextual by establishing that they (1) "had no basis

in fact," (2) "did not actually motivate" Defendants' actions, or "(3) "were

insufficient to motivate" Defendants' actions.  *Chen v. Dow Chem. Co.*, 580 F.3d

394, 400 (6th Cir. 2009) (citing *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 460

(6th Cir. 2004)).  A reasonable jury could find Defendants' stated reasons to be

pretextual.

The timing between Hooks' and Ferrer's protected activity and their

termination is one consideration supporting their claim of pretext.  *See Asmo v.

Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006) (citations omitted) (indicating that,

while temporal proximity cannot alone prove pretext, it "can be used a[s] 'indirect

evidence' to support an employee's claim of pretext"); *Seeger v. Cincinnati Bell

Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Bell v. Prefix, Inc.*, 321 F.

App'x 423, 431 (6th Cir. 2009)) (providing that "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence"). While the evidence does not reflect exactly when Hooks complained to Howard and Kelley about race discrimination at the Club, the short duration of Hooks' employment leads to the conclusion that it had to have been within a month of her termination.  Ferrer was terminated the same day that she complained about the unequal treatment of Black guests.

Also supporting a finding that Hooks' termination was a pretext for discrimination and/or retaliation is Kelley's testimony that when Uralli instructed her to terminate Hooks, Uralli never mentioned any threats of physical harm toward Walker and did not identify who reported Hooks' statement that Uralli was racist and that she was going to "take [Uralli] out back."  Kelley found it hard to believe that someone would threaten Uralli, and felt that Uralli was not concerned for her safety.  Kelley asked Club staff about the allegations, and no one could corroborate that Hooks had threatened Uralli.  Hooks denies making the statement.

With respect to Ferrer, she had never been told that the Club's bathrooms were off limits to the public, and she had seen Caucasian individuals who were not guests using the bathroom without being questioned.  Armstrong was unaware of anyone being terminated for allowing the public to use the bathrooms.  Uralli testified that Ferrer kept laughing when confronted about letting Hook and his

31

girlfriend use the bathroom, and Uralli wrote on the termination form that Ferrer argued with management and supervisors; however, the video of the incident does not support either accusation.  Armstrong and Daye testified that Ferrer had never argued with them.

When Ferrer was informed of her termination, she was not told that it was because she had violated the Club's policies.  Instead, she was told she was not a "good fit."  When Daye brought to Uralli's attention that Ferrer thought the incident with Hook and his girlfriend had been discriminatory, Uralli responded: "I hate her."

In short, a jury could reasonably conclude that Defendants' stated reasons for terminating Hooks and Ferrer were pretextual.  As such, Defendants are not entitled to summary judgment on Hooks' or Ferrer's retaliation or discrimination claims based on their terminations from the Club.

## F.    Hostile Work Environment

Plaintiffs claim that they were subjected to a hostile work environment based on race in violation of Title VII (Ferrer and Lisée) and ELCRA (all Plaintiffs).  To succeed on their claims, Plaintiffs must show that: (1) they "belonged to a protected group"; (2) they were "subject[ed] to unwelcome harassment"; (3) "the harassment was based on race"; (4) "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working

environment"; and (5) Defendants are liable for the harassment.  *Johnson v. Ford Motor Co.*, 13 F.4th 493, 503 (6th Cir. 2021) (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)); *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012) (providing that the "ELCRA hostile work environment analysis is identical to Title VII's analysis.").

When analyzing the third requirement—whether the harassment was based on race—a "[c]ourt may only consider 'harassment *based on the plaintiff's race*.'" *Bradley v. Arwood*, 705 F. App'x 411, 417 (6th Cir. 2017) (quoting *Williams*, 643 F.3d at 511).  "A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id*. (quoting *Williams*, 643 F.3d at 511).  The Sixth Circuit has noted that " 'even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for' the plaintiff's race." *Johnson*, 13 F.4th at 507 (quoting *Jackson*, 191 F.3d at 662).  Additionally, harassment directed at someone other than the plaintiff can contribute to a hostile work environment if the plaintiff learns of it.[8]  *Strickland v. City of Detroit*, 995

---

[8] The plaintiff's knowledge of the harassment is an important requirement that Plaintiffs' counsel overlooks when sharing his opinion that "[i]n all of [his] years

F.3d 495, 504 (6th Cir. 2021) (quoting *Jackson*, 191 F.3d at 661) ("It is well-established that incidents of racial harassment that a plaintiff learns of secondhand and did not personally experience may 'contribute to a work environment that was hostile . . ..").

Defendants are entitled to summary judgment on Lisée's hostile work environment claims because he bases his claims on the harassment of Black employees and patrons. Lisée is Caucasian.[9] Defendants also are entitled to summary judgment on Ferrer's claims because she too relies primarily on the harassment of individuals outside of her protected class.[10] The only evidence of

---

as an attorney, [he has] never encountered a work environment so permeated with racist comments, discriminatory treatment, insults, deceit, and short-fused reactionary retaliation." (ECF No. 71 at PageID.9214.) Counsel's opinion based on the evidence collected in this case does not speak to *each* Plaintiff's awareness of the various racially offensive comments or incidents occurring during his or her employment.

[9] The Sixth Circuit has held that a plaintiff, though not within a protected class, may satisfy the first prong of the prima facie case based on the plaintiff's association with or advocacy on behalf of protected employees. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009). The plaintiff, however, must have been personally subjected to harassment as a result of his or her association with or advocacy for protected employees. *Id.* To the extent Lisée attempts to make this showing based on the retaliation he claims he suffered after complaining about racism at the Club, this occurred when he no longer worked there—and, therefore, could not have created a hostile *work* environment—and is indistinguishable from his separate retaliation claims.

[10] Again, like Lisée, Ferrer could prove the first element of her hostile work environment claims based on her advocacy for Black patrons, who she felt were

harassment towards Latinos, which Ferrer seemed aware of during her employment, is Daye's reference to Ferrer as Mexican several times, even after Ferrer explained that she is not Mexican.  Assuming Daye's statements were derogatory, they are insufficient to satisfy the "severe or pervasive" requirement of Ferrer's prima facie case.

Hooks, in comparison, provides sufficient evidence from which a reasonable jury could find that she was subjected to severe and pervasive racial harassment. *See Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 687 (6th Cir. 2024) (quoting *Smith v. Rock-Tenn Servs., Inc.*, 813 F.2d 298, 310 (6th Cir. 2016)) ("Importantly, this Court views whether harassment was severe or pervasive as 'quintessentially a question of fact.'").  This includes Uralli's inquiry when Hooks was hired as to whether she was "white black" or "black black," which Charles Howard allegedly told Hooks about shortly after she was hired.[11]  (ECF No. 69-7 at PageID.7386.) Also included is Uralli's apparent frustration with Howard for hiring too many black people.  (*Id.*)  Finally, the unequal treatment of Black guests, which Hooks

---

subjected to unequal treatment.  The harassment she claims for that advocacy though, is her termination.  Thus, it is indistinguishable from her retaliation claims, too.

[11] During his deposition in this litigation, Howard denied that Uralli made this statement, and he denied hearing any other racist comments by Uralli.  His credibility is a question for the jury, however.

witnessed and learned about through other employees, and which she complained about is also included.[12]  (*See* ECF No. 70-30 at PageID.9133-34, 9146.)

Defendants argue that Hooks cannot establish the Club's liability for the hostile work environment, maintaining that "[t]he vast majority of the comments or conduct that Plaintiffs allege support [a hostile work environment] are claimed to have been done by Daye."  (ECF No. at PageID.7088.)  However, Plaintiffs also present evidence of Uralli's race-based statements and discriminatory treatment of Club patrons.  As the owner of the Club, Uralli certainly was "empowered . . . to take tangible employment actions against [Hooks]."  (*Id*. (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013).)  An employer is strictly liable if a supervisor's harassment culminates in a tangible employment action.  *Vance*, 570 U.S. at 424.

Hooks also complained about the harassment to the Club's general manager and assistant general manager, but nothing allegedly was done in response.  (ECF No. 69-9 at PageID.7569-70; ECF No. 70-30 at PageID.9146.)  An employer is liable for co-worker harassment if it was negligent in controlling working

---

[12] During her deposition, Hooks recalled two incidents where she personally witnessed the mistreatment of Black patrons, although she testified that she heard about other incidents from co-workers. Defendants assert that "[t]here is no evidence to support [the two] incidents[]" Hooks described.  (ECF No. 69 at PageId.7085.)  However, Hooks testimony is evidence.  Again, credibility is for the jury to decide.

conditions. *Vance*, 570 U.S. at 424. For these reasons, the Court is denying

Defendants' summary judgment motion as to Hooks' hostile work environment

claim.[13]

## IV. Conclusion

In summary, the Court grants summary judgment to Daye with respect to

Plaintiffs' ELCRA claims and sua sponte dismisses Lisée's and Hooks' § 1981

claims against her. However, Daye is not entitled to summary judgment as to

Ferrer's § 1981 claims.

The Court also concludes that Defendants are entitled to summary judgment

as to Lisée's race discrimination claims, as well as Lisée's and Ferrer's hostile

---

[13] The Sixth Circuit has stated that the *McDonnell Douglas* framework applies to a plaintiff's hostile work environment claim. *See, e.g., Clay v. UPS, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007); *Kubik v. Central Mich. Univ. Bd. of Trs.*, 717 F. App'x 577, 584 (6th Cir. 2017). Defendants invoke this language in defense against Plaintiffs' claims, arguing that the claims fail because Ferrer and Hooks were terminated for legitimate reasons, and Lisée voluntarily resigned. However, in other cases, the Sixth Circuit has outlined the elements of a plaintiff's hostile work environment case without mention of the *McDonnell Douglas* framework. *See, e.g., Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002); *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 484 (6th Cir. 2020). Even where the Sixth Circuit invokes this framework in connection with a hostile work environment claim, from what this Court found, it has not proceeded beyond the plaintiff's prima facie case. It seems both odd and unjust to say that if a plaintiff shows that he or she was subjected to a hostile work environment, the employer could evade liability by demonstrating a legitimate, non-discriminatory reason for allowing that environment to persist. This Court cannot fathom a legitimate reason for subjecting employees to severe or pervasive unlawful harassment.

work environment claims.  Defendants also are entitled to summary judgment as to Lisée's retaliation claims to the extent he claims he was constructively discharged in retaliation for protected conduct.

The Court denies summary judgment to Ferrer and Hooks on their retaliation claims based on direct evidence, although there are questions of fact material to whether they can prevail on their claims through circumstantial evidence.  Lisée is entitled to summary judgment on his retaliation claims against the Club and Uralli to the extent premised on retaliation after he resigned.

Based on the Court's conclusions, the following claims asserted in Plaintiffs' Second Amended Complaint remain for trial:

(Count I)     Retaliation in violation of § 1981 by Ferrer against Defendants and by Hooks against the Club and Uralli;

(Count II)    Retaliation in violation of Title VII by Ferrer against the Club;

(Count III)   Retaliation in violation of ELCRA by Ferrer and Hooks against the Club and Uralli

(Count V)     Hostile work environment in violation of ELCRA by Hooks against the Club and Uralli;

(Count VI)    Race discrimination in violation of § 1981 by Ferrer against Defendants and by Hooks against the Club and Uralli;

(Count VII)   Race discrimination in violation of Title VII by Ferrer against the Club; and

(Count VIII)  Race discrimination in violation of ELCRA by Ferrer and

38

Hooks against the Club and Uralli.

As indicated, Lisée is granted summary judgment as to his § 1981, Title VII, and

ELCRA retaliation claims against the Club and Uralli based on retaliation after his

resignation, and so those claims will not be presented to a jury.

Accordingly,

**IT IS ORDERED** that the parties cross-motions for summary judgment

(ECF Nos. 69 and 70) are **GRANTED IN PART AND DENIED IN PART**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: August 27, 2025