UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**VICTORIA FERRER (AKA**
**MARIA VICTORIA FERRER),**
**CHARLES LISÉE,** and
**MIYA SHANI HOOKS,**

          Plaintiffs,

vs.

**DETROIT CLUB MANAGEMENT**
**CORP** d/b/a **THE DETROIT CLUB,**
**SUZETTE DAYE**, and **LYNN KASSOTIS**
**(AKA LYNN URALLI),**
jointly and severally,

          Defendants.

Case No. 22-cv-11427

Hon. Linda V. Parker
Magistrate Judge Kimberly G. Altman

_____/

| | |
|---|---|
| Jack W. Schulz (P78078) | Gregory M. Meihn (P38939) |
| SCHULZ LAW PLC | Matthew T. Wise (P76794) |
| 645 Griswold St. Suite 4100 | Jason B. Brown (P79226) |
| Detroit, MI 48226 | GORDON REES SCULLY |
| (313) 246-3590 | MANSUKHANI |
| jack@michiganworkerlaw.com | 37000 Woodward Avenue, Suite 225 |
| *Attorney for Plaintiffs* | Bloomfield Hills, MI 48304 |
| | (313) 426-9815 \| Fax: (313) 406-7373 |
| Herbert A. Sanders (P43031) | *Attorneys for Defendants* |
| THE SANDERS LAW FIRM, P.C. | |
| 4031 Santa Clara St. | Wright W. Blake (P37259) |
| Detroit, MI 48221 | 155 W Congress St., Suite 410 |
| (313) 798-6356 | Telegraph Building Detroit, MI 48226 |
| Herbert@SandersForJustice.com | (313) 964-2080 |
| *Attorney for Plaintiffs* | bwrightlaw@yahoo.com |
| | *Attorneys for Defendants* |

_____/

**PLAINTIFFS' TRIAL BRIEF**

NOW COMES Plaintiffs Maria Victoria Ferrer, Charles Lisee, and Miya Shani Hooks, by and through counsel, for their Trial Brief, stating as follows:

## I.   STATEMENT OF FACTS

Defendant Detroit Club Management Corp. ("TDC") is a social club in Detroit which includes a restaurant, bars, cigar lounge, and twenty-one hotel rooms. TDC has members, however, patrons do not need to be a member to enter and non-members can do everything available to members.

TDC is owned by Defendant Lynn Uralli ("Uralli")(Caucasian), who also serves as the TDC's President. It is undisputed Uralli has the ability to discipline and terminate employees. Uralli's management style is very "involved" and "hands on." In fact, former Assistant GM Colleen Kelley ("AGM Kelley") stated that Uralli would threaten employees' positions if they did not do exactly what she said.

Defendant Suzette Daye ("Daye")(Caucasian) worked as the Front Office Manager from around TDC's grand opening until September 2022. In this position, Daye supervised the front desk employees, including Plaintiff Victoria Ferrer ("Ferrer"). For the majority of Daye's employment, she was supervised by General Manager Chance Armstrong ("GM Armstrong")(Caucasian). According to AGM Kelley, Daye privately vocalized discriminatory attitude and beliefs and was "like a guard" at the door and was stringent with African American guests but allowed Caucasians to enter.

2

<u>TDC'S Unequal Enforcement of the Dress Code</u>

TDC has a dress code which is posted at the front entrance and desk. Testimony on the actual parameters of the dress code varies. According to Uralli, the dress code is business casual; jeans and Bermuda shorts are allowed, as are uncollared shirts, preferably with a jacket. According to Daye, the TDC dress code is just applying "common sense." According to AGM Kelley, the dress code "should have been business or dress attire" but was more of a "hopeful guideline that was more often broken than not" and it was not consistently applied. Plaintiffs Ferrer, Lisee, AGM Kelley, and potentially others, will testify that Uralli was much more forceful with the dress code towards African Americans.

Certain exceptions to TDC's dress code are undisputed. For example, the dress code is not enforced when guests are checking in and out of a hotel room or the spa. Also, guests are allowed to wear sports memorabilia, including hats, on game days.

<u>Plaintiff Miya Hooks was Terminated in Retaliation for Complaining that TDC Members were being Discriminated Against on the Basis of their Race, and for Complaining that Uralli was Racist</u>

Plaintiff Miya Hooks ("Hooks")(African American) was hired as a server by former General Manager Charles Howard ("GM Howard") when Uralli was out on foot surgery. According to GM Howard, Uralli immediately asked if Hooks was

3

"black black or white black." Notably, coworkers informed Hooks that she would be fired if she ever questioned Uralli.

Hooks will testify to several incidents where African American were denied entry or harassed due to their dress while Caucasian patrons were seated out of dress code. Hooks, as well as others, believe that Uralli used the dress code as a means to turn away African Americans.

Hooks was initially supervised by GM Howard then AGM Kelley after about a month. Hooks verbally complained about the unequal treatment of African American guests to both AGM Kelley and GM Armstrong. GM Armstrong testified that he spoke directly with Uralli about Hooks' complaints of racism.

On November 24, 2021, Hooks was notified of her termination by AGM Kelley. Uralli instructed AGM Kelley to fire Hooks right away, in part because "someone she trusts" stated that Hooks called Uralli racist. AGM Kelley will testify that Uralli *explicitly* told her to terminate Hooks because Uralli was told that Hooks called her racist. After, Uralli texted GM Armstrong that she never wanted to see Hooks again.

<u>Plaintiffs Charles Lisée and Maria Victoria Ferrer</u>

Plaintiff Charles Lisée ("Lisée") began working as a bartender at the Detroit Club in November of 2021, primarily working in the Library Bar. During his employment, Lisée saw several African American patrons who were frustrated due

4

to being harassed or "shaken down" regarding the DC dress code. African American guests also expressed that "their kind was not welcome" there. Lisée's personal friend Dawn (African American), as well as her sister, stated to him they were discriminated against by Daye, that they "can't believe this still happens in 2022", and that they filed a complaint with TDC that it was the worst racial discrimination they ever experienced.

Around this time, Lisée met with GM Armstrong 1-2 times in person about witnessing unequal treatment of African American guests at the TDC, specifically unequal enforcement of the dress code. Lisée made similar complaints to his supervisor Thomason. In response to Lisée's complaints, GM Armstrong recommended to Uralli that the TDC hold a diversity and inclusion training. However, no such training was ever put into action.

In March 2022, Plaintiff Ferrer (Latino) was hired as Front Desk Clerk under the supervision of Daye. The job duties of a front desk agent are: check in, check out, coat check, greeting guests and selling merchandise. It was Armstrong's decision to hire Ferrer. Uralli did not train Ferrer on the dress code but claims Daye did. Ferrer was not told the bathrooms were private as the building was open to everyone.

<u>Incident of Racism involving a couple checking into the hotel</u>

The evidence will show that on or around April 8, 2022, Daye approached Ferrer while she was checking in two African American guests. The couple was checking into the hotel, so they were not required to be in dress code. Nonetheless, Uralli (who was watching remotely) contacted Daye and to go approach the guests about the dress code. Daye aggressively told the guests if they didn't like the dress code then they could go home. The guests accused TDC of being racist. Once things settled, Ferrer confronted Daye alleging that the dress code at TDC was being enforced in an unequal way based on race, specifically that TDC was being racist and that it did not apply the rules equally to Caucasians as it did African Americans. The racist incident witnessed made Ferrer feel very uncomfortable. In fact, Uralli specifically overruled Ferrer and let in a group of Caucasian individuals out of dress code on the day of Ferrer's termination. According to Daye, guests have complained to her about racism at TDC before, but if a black guest isn't happy, they'll say it's because they're black which inherently makes her a racist.

Testimony will demonstrate that Ferrer reported to Uralli that she believed Daye to be racist. In response, Uralli asked Ferrer if Ferrer "thought she was black" and that she was confused as to why Ferrer cared if Ferrer wasn't African American. Uralli told Ferrer that Daye is not racist, but that she is an older lady. Later, Daye and Uralli spoke about how Ferrer thought Daye was racist but not the actual

incident. Notably, Uralli acknowledges the guests didn't actually do anything wrong as guests of the hotel do not need to be in the dress code when they check in.

On April 9, 2022, Lisée submitted an email to Armstrong relating to the racism at TDC. The email was then forwarded to Uralli and Thomason. No actual investigation was done. Instead, Uralli previously testified that she was more interested in finding what Ferrer and Lisée were up to than investigating any real valid racism that would be going on. Uralli describes Ferrer's protected complaints of perceived racism as "wreaking havoc" and frustrating to her. In a subsequent text, Uralli poked fun at Ferrer's accusations of racism.

Darryl Brown incident

Darryl Brown ("Brown")(African American) is a former Detroit Police Commissioner and retired fireman. At the time, Brown was a candidate for the Michigan State Senate and former member of the TDC. Testimony will show that on April 21, 2022, Brown was meeting with a colleague, Dr. Regina Randall ("Dr. Randall")(African American) to strategize about his campaign. The front desk agent (Daye) notified Dr. Randall to leave several times and that they did not know any "Mr. Brown", despite him being a member, and asked her to leave. Daye was stern/aggressive with Dr. Randall and she was not given the courtesy of being taken upstairs to the restaurant and instead told to wait in the lobby. Brown spoke with her on the phone and tried to calm her down. Brown and Ferrer believe a Caucasian

7

individual would have been taken upstairs to wait. Both Brown and Dr. Randall believe she was treated this way due to her race. The evidence will demonstrate that the entire incident was witnessed by Ferrer who reported it to GM Armstrong because Caucasian guests are allowed to sit in the Library bar and wait for guests. Mr. Brown will testify that he stopped going to the TDC due to the disparate treatment of African Americans.

Kody Hook incident

On April 23, 2022, an incident occurred involving Kody Hook ("Kody") (Mixed Race) and his girlfriend (African American) entering TDC to use the restroom. Notably, the incident occurred on a Tiger's game day when the dress code was relaxed and they were dressed the same as Caucasian guests. According to Kody (and Ferrer), he was approached by Uralli who asked him "what the hell was he doing" then said to "never let street rats" in TDC to Ferrer. Ferrer had seen Caucasian people use the bathrooms without being questioned. Kody then told Ferrer that Uralli "has a bad review coming." Kody submitted a review outlining his racist treatment by Uralli and being called a "street rat." Ferrer spoke to Daye about how disrespectful Uralli was and asked to be excused (to go behind the building in tears).

The Retaliation against Ferrer and Lisee

The same day as the Kody Hook incident, evidence will demonstrate that Daye brought it to Uralli's attention that Ferrer believed the incident to be racism.

8

After, Uralli never spoke to Ferrer again. Uralli texted Daye stating, "I hate her" in reference to Ferrer. Daye responds "[i]t's the racist thing. It's just stupid." Uralli instructed GM Armstrong to terminate Ferrer, which he did. The following day, Thomason emailed TDC leadership outlining that she had learned Ferrer was terminated due to her complaints of racism and, although she didn't agree with these complaints, that "[i]t is very clear we are at a point that some sort of minority sensitivity training may need to be set in place." Also, that she was approached by Lisee who was visibly shaken and "used the term racist and racism many times." Further, that this was the third conversations she had with staff regarding racism at the club in a short period.

The day after Ferrer's termination, Lisée submitted his resignation through a letter outlining the racism at the club and his prior complaints. The letter was also posted by Lisée on Facebook. Testimony will demonstrate that Uralli instructed GM Armstrong to submit a letter to the staff claiming that Lisée's claims were without merits and investigation would occur into "intentional foul play." No actual "investigation" occurred. The evidence will further demonstrate that Uralli also sent Lisée a barrage of completely unhinged threats to his personal safety and real estate license, as well as a threat to put him and Ferrer in jail. Evidence has demonstrated that Uralli instructed Manager Thomason to contact a real estate broker who is a mutual friend to smear Lisee, and Thomason agreed. Thomason also responded to

9

Uralli, "I told Chance the last time all this came up we needed to address it and do some training or something to cover our asses" (in response to Lisée's complaints of racism).

## II.   PLAINTIFFS' THEORY OF THE CASE

> ### a. Defendants terminated Plaintiff Hooks in retaliation for her protected complaints of racism and discriminated against her and subjected her to a hostile work environment due to her race

Plaintiff Hooks will demonstrate that she was retaliated against due to a protected complaint through, among other ways, through her own testimony and the testimony of Colleen Kelley ("Kelley") and Chance Armstrong ("Armstrong"). Their combined testimony will demonstrate that Plaintiff Hooks observed unequal treatment against African American guests of TDC and submitted internal complaints which were passed on to Defendant Lynn Uralli ("Uralli"). Ultimately, Uralli learned that Hooks referred to her as being racist and, in response, immediately instructed Kelley to terminate Hooks for that reason.

Additionally, Hooks will be able to support her claims of racial discrimination and hostile work environment through testimony and physical evidence of negative animus towards African Americans, including her specifically, by Defendant Uralli.

Although Hooks plans to demonstrate her claims through witness testimony and a range of exhibits, she plans on introducing the following evidence: the following is her strongest physical evidence.

10

In addition to the witness testimony, Hooks will offer the following evidence:

| Exhibit No. | Exhibit Title | Bates No./Doc Id. No. | Explanation |
|---|---|---|---|
| 8 | Texts between Uralli and Armstrong | DC FERRER 000146-147 | Uralli discusses her instructions that she "never wants to see Mya again" |
| 10 | Recording of Kelley call to Hooks | DC HOOKS 20 | Kelley calls and apologizes for her participation in Hooks retaliatory termination. Kelley states that she felt pressured and instead should have stood up for Hooks. |

Plaintiff Hooks' case will also be supported through the testimony of supervisors and coworkers, including, but not limited to: (1) Colleen Kelley; (2) Regina Djordjevic; (3) Charles Howard-Putnam; and (4) Chance Armstrong, who witnessed or participated in events relevant to her claims.

  b. *Defendants terminated Plaintiff Ferrer in retaliation for her protected complaints of racism and discriminated against her due to her race*

Plaintiff Ferrer will demonstrate that she was discriminated against due to her race and terminated in retaliation of her protected complaints of observed unequal treatment against African American guests of TDC through, among other ways, through her own testimony and the testimony of Plaintiff Charles Lisee, Armstrong, and Defendants Uralli and Daye. Ferrer. Their combined testimony will demonstrate that Ferrer observed unequal treatment against African American guests of TDC and submitted internal complaints which were passed on to Defendant Uralli. Further,

that Uralli responded to Ferrer's complaints by questioning if she thought she was African American. Ferrer will introduce evidence demonstrating that Uralli poked fun at Ferrer's complaints of racism. Ferrer will introduce evidence that Defendant Daye continuously referred to her as being "Mexican", despite having national origin from Panama and frequently correcting her. Ferrer will also introduce evidence that on her final day of employment, she submitted a complaint regarding observed discrimination of an African American guest of TDC. Following the complaint, Defendants Uralli and Daye exchanged texts about they "hate" Ferrer and that she "has to go" due to the racist thing. Ferrer is terminated at the end of her shift.

In addition to the witness testimony, Ferrer will offer the following evidence:

| Exhibit No. | Exhibit Title | Bates No./Doc Id. No. | Explanation |
|---|---|---|---|
| 27 | Texts between Uralli and Daye | Ferrer v Detroit Club 3rd Supp_0018-21 | Uralli comments that she hates Ferrer in reference to the protected complaints. Within the same conversation, Daye states that Ferrer needs to be terminated due to the "racist" thing |
| 30 | 2022.4.24 Thomason email | DC FERRER 1 000379-380 | Thomason emails that she learns of the reason for Ferrer's termination, alludes to her complaints of racism at the club, and recommends racial sensitivity training |

Plaintiff Ferrer's claims will also be supported through the testimony of her coworkers, supervisors, and guests of the Detroit Club, including, but not limited to:

12

(1) Plaintiff Charles Lisee; (2) Chance Armstrong; (3) Darryl Brown; (4) Kody Hook; (5) Suzette Daye; (6) Jenny Thomason; and (7) Lynn Uralli.

### c. *Plaintiff Charles Lisee has proven retaliation and is entitled to damages*

The Court has already determined liability against Defendants TDC and Uralli for the retaliation against Plaintiff Lisée's which occurred following his resignation, in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e., and Michigan's Elliot-Larsen Civil Rights Act, M.C.L. § 37.2101.

Plaintiff Lisée's damages will also be supported through the testimony of his treating therapist, supervisors, and coworkers, including, but not limited to: (1) Josh Curie (Expert); (2) Plaintiff Victoria Ferrer; (3) Chance Armstrong; (4) Jenny Thomason; and (5) Lynn Uralli.

## III.  ANTICIPATED EVIDENTIARY ISSUES

### a. *Testimony from Chance Armstrong through remote video conferencing*

The Parties are in agreement to allow witness Chance Armstrong ("Armstrong") the ability to testify video remote video conferencing ("Zoom") as he would be traveling in excess of 200 miles in order to testify in Court. Given the burdensome nature of the commute, Armstrong reasonably requested the ability to testify through the use of remote video conferencing. The Parties conferred on this subject on June 7, 2026, and reached an agreement on this topic, subject to Court

13

approval.  Notably, Plaintiff counsel has already discussed the logistics of the remote testimony with Case Manager Flanigan.

Out of respect for the time and resources of Armstrong, Plaintiffs, without objection from Defendants, request the Court allow witness Armstrong's testimony to occur via remote video conferencing on <u>Monday June 15</u>, pursuant to Rule 43(a) and 77(b) of the Federal Rules of Civil Procedure and the Court's inherent ability to manage its cases.

### b. *Defendants' unlawful use of background software to perform criminal background checks on witnesses*

Despite the previous cautioning of the Court, Defendants have listed the criminal background check of witness Kody Hook unlawfully performed utilizing Defendants' real estate software as ***Exhibit EE***. (a redacted copy of the first page has been attached).  On this subject, the Court unambiguously stated:

> "[T]he Court is deeply concerned by Plaintiffs' assertion that Defendants ran criminal background checks for Hooks, Plaintiffs, and others potential witnesses for Plaintiffs through real estate software which restricts such use "for real estate/financial/brokerage purposes only" and possibly in violation of federal and state law.  (See ECF No. 81-1.)  If that is the case, the Court may preclude Defendants from using the information on that basis, alone." *See **ECF No. 105, PageID.12599-12600***

A simple review of Defendants ***Exhibit EE*** affirms the Court's concerns.

***Exhibit EE*** Indeed, the document itself outlines the lawful limitations and further states that the "[u]ser accepts all responsibility civilly and criminally for any use of

14

this system." *See **Exhibit EE*** It is unclear why Defendants would continue to advance this document in light of clear regulatory warnings, warnings from Plaintiff counsel, and finally warnings from the Court.

At a minimum, Plaintiffs request this document be excluded from evidence. However, given the unlawful nature of Defendants' use of its real estate software, the Court's prior warning, and the fact that the software was unlawfully used for several individuals, including Plaintiff Baugh's then boyfriend (ECF No. 81-1, PageID.12205), Plaintiff Counsel respectfully supports any additional actions the Court deems just and proper.

> c. *Defendants have indicated that they plan to submit an expert report into evidence without producing the individual who examined Plaintiff Lisee or completed the report to testify regarding his expert opinion*

As ***Exhibit Y***, Defendants have listed a medical report compiled by their retained expert, Dr. Norman S. Miller. However, Defendants have recently indicated that they *may* be presenting someone other than Dr. Miller to discuss the findings of Dr. Miller's evaluation of Plaintiff Charles Lisee. Plaintiffs were not informed of this until well beyond the deadline for Motions *in limine*. Notably, neither party performed a deposition of Dr. Miller and, on information and belief, his examination of Lisee was unrecorded.  Plaintiffs' inability to question Dr. Miller on his qualifications, experience, methods, and the information he considered in formulating his opinions significantly prejudices Plaintiff Lisee.

15

Federal Rule of Evidence 801 defines "hearsay" as a statement that "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the statement." **Fed. R. Evid. 801(c).** Without the testimony of Dr. Miller, the report itself is certainly hearsay as it satisfies both of these elements.

More importantly, Defendants intend to present the document as an expert opinion of an individual who has not yet been certified as an expert. As the Sixth Circuit Court of Appeals has explained:

> "Rule 702 permits the admission of expert opinion testimony not opinions contained in documents prepared out of court. *See Fed. R. Evid. 702.* Rule 703 allows a testifying expert to rely on materials, including inadmissible hearsay, in forming the basis of his opinion. Rules 702 and 703 do not, however, permit the admission of materials, relied on by an expert witness, for the truth of the matters they contain if the materials are otherwise inadmissible. Rather, "Rule 703 merely permits such hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's opinion."

**Engebretsen v. Fairchild Aircraft Corp**., 21 F.3d 721, 728–29 (6th Cir. 1994) (internal quotes omitted); *see also* **Roche Diagnostics Corp. v. Shaya**, No. 19-10264, 2023 WL 7412918, at *6–7 (E.D. Mich. Nov. 9, 2023). In Engebretsen, the Sixth Circuit squarely held that FRE 702 and 703 <u>do not</u> permit the admission, on direct examination, of testifying experts' opinions contained in written documents prepared out of court, reasoning that "Rule 702 permits the admission of expert opinion testimony not opinions contained in documents prepared out of court." **Id.** at

16

728-729. FRE 703 similarly provides no independent basis to admit an expert report. While that rule allows a testifying expert to rely on otherwise inadmissible materials in forming opinions, *Engebretsen* held that FRE 703 "merely permits such hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's opinion." ***Id.***

Thus, when the expert is not present, FRE 702 nor 703 provides any vehicle for admission of the expert's report. Indeed, another Court in this circuit specifically applied *Engebretsen* to sustain a hearsay objection to the admission of expert reports. *See **In re Murray Metallurgical Coal Holdings, LLC***, 623 B.R. 444 (2021) (objection sustained to admission of an expert report as inadmissible hearsay, citing Engebretsen for the proposition that an expert report is hearsay even when the expert is scheduled to testify, let alone when the expert is absent).

As of now, Defendants have not identified the new "expert" and, as a result, Plaintiff Lisee is also prejudiced by being in the complete dark as to who the individual actually is. At best, Plaintiffs will have less than a week, during trial, to investigate this individual's credentials, background, and prior testimony in similar matters. Plaintiffs will also be without any prior context of how this person developed their opinions as to Lisee without ever having met him and is exclusively relying on the work of others.

      *d. Defendants may reject the authenticity of the emails and documents*
            *unproduced in discovery*

Based upon Defendants' recent assertions within Defendants' Motion for Reconsideration, Plaintiffs reasonably anticipate that certain witnesses of Defendants will question the authenticity of emails for which they themselves are a party to the email. Further, Defendants maintain objections to these documents within the parties objection chart. Plaintiffs' theory is also supported by Defendants' odd decision to omit as a named witness its former General Manager Chance Armstrong, the individual who authenticated the documents via affidavit, despite Armstrong having a supervisory role over all Plaintiffs, being consistently involved in the underlying facts, and being the individual who informed Plaintiff Ferrer of her termination. Defendants should not be allowed to weaponize their previous malfeasance in trial, especially when Plaintiffs are barred from speaking on Defendants' prior sanctions on this topic.

The Court is well advised of the circumstances and authenticity of the particular emails and documents in question. Plaintiff respectfully request the Court considers the totality of circumstances when considering their admission into evidence.

      *e. Defendants have listed personal medical records of Plaintiff Miya*
            *Shani Hooks as an exhibit which are of no relevance to any claim or*
            *defense in litigation*

Although it is potentially an oversight with so many moving parts, Plaintiff Counsel requested specificity concerning which of Plaintiff Hooks' medical records

18

constitute *Exhibit Z*.  As of this filing, no additional clarity has been provided. As imagined, Defendants subpoenaed *several* medical records of Plaintiff Hooks, including, but not limited to records of prior personal medical conditions of no potential relevance to any claim or defense in litigation.  As Plaintiffs see now proper use for private medical information unrelated to the present litigation, it is very possible they will be used for an improper purpose.  As such, Plaintiffs respectfully request the Court instruct the Defendants to explicitly identify which records constitute *Exhibit Z* to allow for productive dialogue on the topic outside of it occurring during trial before a jury.

   f.   *Defendants have included all but one deposition transcript as an exhibit in this case, therefore Plaintiff requests the final deposition transcript also be added as an exhibit*

Whether an oversight or intentional, Defendants have listed as exhibits the transcripts of each deposition with a single exception, witness Darryl Brown. This omission was not something on Plaintiffs' radar until now. As such, if all depositions are to be included as exhibits, then Plaintiffs respectfully request that Mr. Brown's deposition be added as well, potentially as Plaintiffs' Exhibit 52.

Respectfully submitted,

By: /s/ Jack W. Schulz
Jack W. Schulz (P78078)
SCHULZ LAW PLC
645 Griswold St. Suite 4100
Detroit, MI 48226

19

(313) 246-3590
jack@michiganworkerlaw.com
*Attorney for Plaintiffs*

Herbert A. Sanders (P43031)
THE SANDERS LAW FIRM, P.C.
4031 Santa Clara St.
Detroit, MI 48221
(313) 798-6356
Herbert@SandersForJustice.com
*Attorney for Plaintiffs*

Date: June 7, 2026

20

## PROOF OF SERVICE

I hereby certify that on June 7, 2026, I served a copy of **PLAINTIFFS' TRIAL BRIEF**, along with this Proof of Service to all counsel of record via the Court's electronic filing system.


/s/ Jack W. Schulz
Jack W. Schulz

21